Albert A. Ciardi, III, Esquire
Jennifer C. McEntee, Esquire
CIARDI CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA  19103
aciardi@ciardilaw.com
jcranston@ciardilaw.com
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
Proposed Counsel for the Debtor

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re:* | : |
| | :    **Chapter 11** |
| **BLT Restaurant Group LLC,** | : |
| | : |
| Debtor. | :    **Bankruptcy No. 22-10335-lgb** |
| | : |

**MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (A) AUTHORIZING AND APPROVING DEBTOR'S POST-PETITION FINANCING; (B) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (C) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (D) MODIFYING THE AUTOMATIC STAY; (E) SCHEDULING A FINAL HEARING; AND (F) GRANTING RELATED RELIEF**

TO THE HONORABLE LISA G. BECKERMAN,
UNITED STATES BANKRUPTCY JUDGE:

      BLT Restaurant Group, as debtor and debtor in possession, (the "Debtor"), respectfully submits this motion (the "Motion") for an order, pursuant to sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Federal Rules"), authorizing to Debtor to enter into

secured post-petition financing and granting related appropriate relief (the "Motion"). In support of this request, the Debtor states:

## INTRODUCTION

1.  On the date hereof (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief the Debtor seeks are sections 105(a), 361, 362, 363(b)(1) and 364(c)(2) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

3.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in this case.

4.  The Debtor relies upon the Affidavit of James Haber under L.R. 1007-2.

## BACKGROUND

5.  The Debtor is a limited liability company organized under the laws of New York and having, at present, two members – JL Holdings 2002 LLC (99.9%) and Juno Investments LLC (.01%).

6.  JL Holdings 2002 LLC is a limited liability company organized under the laws of New York and is a secured creditor of the Debtor.

7. Juno Investments LLC is a limited liability company organized under the laws of New York.

8. Since 2004, the Debtor represented the best in hospitality, through extraordinary food and unparalleled service. Today, the Debtor is a family of well known, reputable restaurants throughout the world:

1. BLT Steak LLC
2. BLT Steak Waikiki LLC
3. BLT Prime Lexington LLC
4. BLT Steak DC LLC

Of the foregoing locations, the Debtor owns 100% of BLT Steak LLC, BLT Steak Waikiki LLC, BLT Prime Lexington LLC, and owns 75% of BLT Steak DC LLC. These locations continue to operate. Prior to the Petition Date, the Closed Entities[1], as that term is defined in the Plan, ceased operations. The Debtor manages BLT Prime DC LLC, BLT Prime Doral LLC, BLT Steak Florentine LLC, and BLT Steak Charlotte LLC pursuant to management agreements with each restaurant. The Debtor does not own any of the aforementioned managed restaurants but only provides management services through management agreements.

The Debtor, through this family of restaurants, features a team of critically acclaimed chefs, as well as the passionate front of house and back of house team members dedicated to sharing their hospitality expertise with guests. The Debtor is also heavily involved with community outreach and development. By way of one of many examples, the Debtor will be forever grateful for New York City's frontline healthcare

---

[1] BLT Burger DC LLC, E2 Development and Construction, 101 West 57 Restaurant LLC, BLT Steak White Plains LLC, and Casa Nonna NYC are entities that are no longer operating as of the Petition Date and are referred to herein as the "Closed Entities".

workers. To show its continued appreciation, the Debtor provided 60 dinners every Thursday during March and April 2020 for the staff at Lenox Hill Hospital, its neighbor on the Upper East Side of Manhattan. Additionally, Lenox Hill Hospital employees receive a friends and family discount when they dine at BLT Prime Lexington. Similarly, in response to the COVID-19 pandemic, BLT Restaurant Group locations closed their doors for the first time in the company's 16-year history. While closed, the Debtor transformed BLT Prime Lexington into a relief kitchen to serve local New York City frontline workers. With the help of its employees and volunteers, BLT Restaurant Group was able to donate more than 13,000 meals to 14 different hospitals over the period of April to May 2020. The Debtor, like all hospitality groups and restaurants, employees and staff, suffered greatly during the pandemic and availed itself of a Payment Protection Program Loan (the "PPP Loan") in the original principal amount of $3,289,500 on April 28, 2020 in order to restart and continue operations and pay its employees. While the PPP Loan was used for its intended purposes, the Debtor was unable to restart and engage its multiple locations and interest the restaurant employees to come back to work at full capacity in the manner necessary to comply with the forgiveness terms and conditions of the PPP Loan. Indeed, the Debtor received confirmation that approximately $1,300,000 of the PPP Loan will not be forgiven by the federal government. JL Holdings 2002 LLC has already loaned the Debtor $4,286,000 since March 2020 to fund ongoing operations and because JL Holdings 2002 LLC has an existing, secured note payable with the Debtor in the amount of $7,831,000, the amount of debt compared with struggling restaurant operations has become burdensome for the Debtor. The chapter 11 bankruptcy filing is meant to restructure existing secured debt and address the unsecured debt, including the PPP Loan, over two years.

4

## The Pre-Petition Loans

9.  Beginning on February 20, 2020, pursuant to the Amended and Restated Loan Agreement, JL Holdings 2002 LLC made available to the Debtor the principal amount of $5,000,000 (the "Pre-Petition Loan") which included loans existing prior to February 2020 and the Debtor granted JL Holdings 2002 LLC a security interest in all of its assets. Pursuant to the Second Amended and Restate Loan Agreement dated January 20, 2022, JL Holdings 2002 LLC agreed to increase availability under the loan to $10,000,000 and, as of the Petition date, the Debtor and JL Holdings 2002 LLC agree that the balance due under the loan is $7,831,000.

## COMPLIANCE WITH RULE 4001-2

10. To assist the Court in review of the Motion, the Debtor avers as follows:

   (a) The Debtor requests authority to enter into a term loan facility in the original principal amount not to exceed Six Hundred Thousand Dollars ($600,000) (the "DIP Facility") provided by JL Holdings 2002 LLC (the "DIP Lender") in exchange for liens and security interests in the Debtor's assets as well as superpriority administrative expense status.

   (b) The total amount to be borrowed shall not exceed Six Hundred Thousand Dollars ($600,000) of which One Hundred Thousand dollars ($100,000) is needed in the Interim Order and the balance to be available upon request of the Debtor and subject to entry of the Final Order.

   (c) Compliance with the Initial Budget, weekly budgets and variance reports are a material term of the DIP Facility.

   (d) The Interest Rate is 2.0% per annum and the origination fee is 0%. There are no other fees. The Lender is entitled to reimbursement of legal fees and costs.

5

(e) The DIP Facility is subordinate to the existing loans of JL Holdings 2002 LLC with the consent of JL Holdings 2002 LLC.

(f) There are no carveouts other than for Clerk costs and fees to the Office of the United States Trustee.

(g) There is no cross-collateralization and no roll up.

(h) There are no limits on the Court's power or Debtor's fiduciary duties.

(i) The proceeds of the DIP Loan are only to be used under the budget, with a permitted ten percent (10%) variant on a monthly basis of any line item on an accumulating basis. L.R. 4001-2(a)(9).

(j) There are specific events of default concerning:

    (i) conversion of the Debtor's chapter 11 bankruptcy case; or
    (ii) appointment of a trustee.

(k) Deadlines are established for filing a Plan or 363 Motion.

(l) The Debtor may pre-pay DIP Loan at any time without penalty or premium.

(m) There are no jointly administered cases L.R. 4001-2(a)(14), however, the proceeds of the DIP Loan will be used primarily to fund the Debtor's payroll and operations at the Debtor's subsidiary restaurants.

11. The Debtor has not sought alternative financing. The proposed rate and collateral are well below market. Even though JL Holdings 2002 LLC is an insider, the interest rate and terms are fair and reasonable, if not below market, for a similar transaction.

12. Other than a provision for a carveout to the Clerk of the Court and Office of the United States Trustee, there are no carveouts for Debtor or other professionals. The Debtor is permitted to pay budgeted and approved amounts so long as

Debtor is not in default, and so long as the Debtor is within the agreed upon and permitted ten percent (10%) variant on any one-line item accumulating on monthly basis.

13. There are pre-petition obligations to DIP Lender and no waivers as to pre-petition obligations.

14. The Debtor avers that the budget amount for the next thirty (30) days, including the amounts to be drawn under the interim order, is sufficient to meet all administrative expenses and other budgeted expenses in that time period.

## SUMMARY OF THE PROPOSED DIP FACILITY

15. The significant elements of the proposed DIP Facility, as modified and supplemented by the DIP Loan Agreement, DIP Loan Documents, and the proposed Interim DIP Order (collectively, the "DIP Documents") are:[2]

> I. The Debtor has requested and JL Holdings 2002 LLC, a New York limited liability company (together with its successors and assigns) (the "DIP Lender") has agreed to provide a senior secured, super-priority term loan facility in an original principal amount not to exceed Six Hundred Thousand U.S. dollars ($600,000) (the "DIP Loan") pursuant to Section 364(c) of the Bankruptcy Code.
>
> II. The DIP Lender has indicated its willingness to agree to make the DIP Loan to the Debtor, conditioned upon the terms and conditions set forth in the proposed Interim DIP Order and in the other DIP Documents and in accordance with Section 364(c) and of the Bankruptcy Code, so long as the Obligations are (i) secured by Liens on the Collateral granted by the Debtor, subject in priority only to certain Permitted Liens, as hereinafter provided, and (ii) given superpriority, administrative expense status as provided in the Interim Order and, on and after the entry thereof, the Final Order.

---

[2] This summary is qualified in its entirety by reference to the provisions of the DIP Loan Agreement, DIP Loan Documents and the proposed Interim DIP Order. Unless otherwise defined herein, capitalized terms shall have the meanings ascribed therein and in the proposed Interim DIP Order.

7

## AUTHORITY FOR RELIEF

16. The Debtor seeks authority to enter into the DIP Loan Agreement on a post-petition basis and to grant to the DIP Lender the contemplated super-priority claims and senior security interests. Section 363(b)(1) of the Bankruptcy Code provides that the Debtor may use, sell or lease property of the estate, other than in the ordinary course of business, without notice and a hearing. Section 364(c)(2) authorizes the Debtor to obtain credit secured by a lien on property that is not otherwise subject to a lien. Section 105(a) permits the Court to enter any order that is necessary to carry out the provisions of the Bankruptcy Code to further the Debtor's reorganization efforts.

17. Under the terms of the DIP Documents which are attached hereto as **Exhibit "A,"** the Debtor will continue to operate and grow its business in much the same manner it had pre-petition and will specifically. Therefore, the Debtor believes that the requirements of section 363(b)(1), that the Debtor use its property in the exercise of sound business judgment, is satisfied, and the Debtor should be authorized to continue this practice post-petition.

18. Under the DIP Documents, the obligations of the Debtor to the DIP Lender will constitute super-priority obligations pursuant to sections 105 and 364(c)(1) of the Bankruptcy Code with recourse to all post-petition property of the Debtor and the proceeds thereof.

19. To secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to Sections 361, 362, 364(c)(3), and 364(d) of the Bankruptcy Code, the Debtor requests the DIP Lender be granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition (i) second-priority security interests in and liens on all real and personal property

8

of the Debtor of every kind, nature, and description whatsoever, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtor (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, the Debtor, and regardless of where located (collectively, the "DIP Collateral"); and (ii) second-priority priming security interests in and liens on all DIP Collateral, (i) and (ii), collectively, the "DIP Liens"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations. Notwithstanding anything contained herein to the contrary, upon entry of a Final Order providing for such relief, any provision of any license, contract or other agreement that requires the consent or approval of one or more party or the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign or otherwise transfer any such license, contract or other agreement, or the proceeds thereof, or other post-petition collateral related thereto, will be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens in such license, contract or other agreement, or the proceeds of any assignment and/or sale thereof by the Debtor, in favor of the DIP Lender in accordance with the terms of the DIP Loan Documents or the Interim DIP Order. Notwithstanding anything to the contrary in the Interim DIP Order, nothing in the Interim DIP Order shall be construed to prejudice the rights or ability of any Committee or any party-in-interest to object to the entry of any Final Order, or any further post-petition financing.

20. As security for the DIP Obligations, pursuant to Bankruptcy Code §§ 364(c)(1), and (c)(2) and by the consent of the Pre-Petition Secured Party, the Debtor

9

requests the DIP Lender receive, effective and perfected upon the date of the Interim DIP Order and without the necessity of the execution by the Debtor or the filing or recordation of mortgages, security agreements, or otherwise, liens in the DIP Collateral with the following lien priorities (collectively, the "DIP Facility Liens"):

(i) Pursuant to Section 364(c)(2) of the Bankruptcy Code, granting the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected first priority liens on and security interests in all present and after-acquired DIP Collateral (as defined below), wherever located, which is not already encumbered by pre-petition liens held by the Pre-Petition Secured Party, to secure the DIP Obligations; and

(ii) Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, perfected, enforceable, and non-avoidable second priority senior priming liens and security interests in all DIP Collateral now owned or hereafter acquired by the Debtor, and the proceeds thereof; whether or not encumbered by pre-petition liens held by the Pre-Petition Secured Party or any other party.

21. Except as expressly set forth herein, the DIP Liens in the DIP Collateral shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Debtor's Bankruptcy Case, and shall be valid and enforceable against any trustee appointed in the Debtor's Bankruptcy Case, upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code, and/or upon the dismissal of any of the Case or any Successor Cases. The DIP Liens shall not be subject to (i) Sections 510, 549 or 550 of the Bankruptcy Code, or (ii) Sections 506(c) of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code with respect to DIP Collateral shall be

*pari passu* with or senior to the DIP Liens. The Debtor will therefore be expressly prohibited from conveying, pledging, encumbering, selling, leasing, licensing, assigning, transferring, or otherwise disposing of its receivables related to or otherwise associated with the DIP Collateral.

22. As protection for the DIP Obligations now existing or hereafter arising pursuant to the DIP Facility, the DIP Loan Documents and the Interim DIP Order, the Debtor requests the DIP Lender receive, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Superpriority DIP Claim") for all of the DIP Obligations with priority over any and all other obligations, liabilities, administrative expense claims and unsecured claims against the Debtor or its estate in the case other than fees or costs to the Clerk of the Court or the Office of the United States Trustee now in existence or hereinafter arising at any time, of any kind or nature whatsoever; including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code regardless of whether such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

23. The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code[3] is a finding, made after notice and a hearing, that

---

[3] Section 364(c) of the Bankruptcy Code provides that:
If the trustee [or debtor in possession] is unable to obtain secured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

11

the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

24.  Where (a) the debtor is unable to obtain unsecured credit on an administrative expense basis pursuant to section 364(b), (b) the credit transaction is necessary to preserve the assets of the estate, and (c) the terms of the transaction are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender, financing under section 364(c) is appropriate. *See, e.g., In re Aqua Associates*, 123 B.R. 192, 195-6 (Bankr. E.D. Pa. 1991); *Ames Dept. Stores*, 115 B.R. at 37-39.

---

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3) secured by a junior lien on property of the estate that is subject to a lien.

**Obtaining Credit on an Unsecured Basis**

25.     The Debtor represents that given its current financial condition, financing arrangements and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than provided for in the DIP Facility. The Debtor has been unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor also has been unable to obtain sufficient credit (a) having priority over that of administrative expenses of the kind specified in Sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured solely by a lien on property of the Debtor and its estate that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien. Financing on a post-petition basis is not otherwise available without granting the DIP Lender (x) perfected security interests in and liens on (each as provided herein) the DIP Collateral and after-acquired assets with the priorities set forth herein, (y) superpriority administrative expense claims, and (z) the other protections set forth in the Interim Order.

26.     Specifically, the Debtor submits that it would be impossible to obtain unsecured credit during the pendency of this case as the Debtor has no significant unencumbered assets. In accordance with Section 364(c), the Debtor represents that it is unable to obtain credit for its operations on an (a) unsecured basis; (b) on the basis of an administrative expense claim; or (c) on any basis more favorable to the Debtor than proposed in the Motion.

27.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d). *Id.; see, also, In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there

are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

28. The Debtor's ability to enter into the DIP Facility with the DIP Lender is a critical component of the Debtor's successful chapter 11 case. The Debtor negotiated with two lenders and is proceeding with the most cost-effective agreement.

**Necessity of the Financing**

29. The Debtor requires the DIP Loan in order to meet its payroll needs and to fund operations deficiencies at the restaurant level while working toward reopening all restaurants at maximum capacity and emerging from the pandemic.

30. As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtor's management has concluded that the DIP Facility is necessary to preserve the assets of the estate. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

31.     In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted). *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the debtor in possession of facilities were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Cf., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Co. 1985) ("Business judgments should be left to the board room and not to this Court"); *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Associates*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second guess a debtor in possession's business decision when they involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

32.     Without the liquidity provided by the contemplated DIP Facility, the Debtor will be unable to fund operating deficiencies at the restaurant level and pay employees, vendors and other constituencies that are essential to the orderly operation of

their businesses. The Debtor's managers have exercised their best business judgment in negotiating the DIP Documents that are presently before the Court.

33. No party in interest can seriously contend that the Debtor does not need immediate access to a working capital facility.

34. Accordingly, access to the DIP Facility is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtor's vendors and suppliers, purchasing new inventory, and otherwise financing its operations. Access to sufficient cash is therefore critical to the Debtor. In the absence of immediate access to cash and credit, the Debtor's will be unable to pay general fixed operating expenses and payroll or benefits.

**Fairness of the Financing: Business Judgment and Good Faith Pursuant to §364(e).**

35. In the Debtor's business judgment, the terms of the DIP Documents are reasonable under the circumstances of this case. These terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Facility is to enable the Debtor to meet ongoing operational expenses.

36. Similarly, the Debtor believes that the terms and assurances required by the DIP Lender under the DIP Documents are commercially reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

37.     Specifically, the Debtor submits that the extension of credit under the DIP Facility, governed by the terms and conditions of the DIP Loan Documents, the fees paid and to be paid thereunder, and the proposed Interim DIP Order as it relates to the Interim Financing: (a) are fair and reasonable; (b) are the best available to the Debtor under the circumstances; (c) reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration. The DIP Facility was negotiated in good faith and at arms' length among the Debtor and the DIP Lender. Therefore, the Debtor submits that the contemplated terms of the proposed DIP Facility are fair and reasonable.

38.     In sum, the Debtor has exercised sound and prudent business judgment in determining that post-petition DIP Funding is necessary and appropriate, and it has satisfied the legal prerequisites to incur debt. In short, without approval of the relief requested, the Debtor will be unable to continue operating. Accordingly, the Debtor should be granted authority to enter into the DIP Documents.

## NOTICE

39.     No examiner, trustee or official creditors' committee has been appointed in this chapter 11 case. The United States Trustee, the Debtor's 20 largest unsecured creditors and all creditors which the Debtor is aware may assert a lien against its property have been given notice of this Motion. The Debtor respectfully submits that no further or other notice need be provided.

## WAIVER OF MEMORANDUM OF LAW

40.     The Debtor requests that the Court dispense with the requirement of Local Bankruptcy Rule 9013-1(a) for a memorandum of law. This Motion does not

17

present a novel issue of law that would require consideration of any authorities other than those set forth herein.

41. No previous application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of an order substantially in the form annexed hereto as **Exhibit "B"** approving and authorizing the DIP Documents, together with such other and further relief as may be just and proper.

Dated: March 22, 2022

        **CIARDI CIARDI & ASTIN**
        Proposed Attorneys for the
        Debtor and Debtor in Possession


        By:*/s/ Jennifer C. McEntee*
        Albert A. Ciardi, III, Esquire
        Jennifer E. Cranston, Esquire
        1905 Spruce Street
        Philadelphia, PA 19103
        (T) 215-575-3550
        (F) 215-575-3551
        Proposed Attorneys for the Debtor and
        the Debtor-in-Possession