# EXHIBIT A
# Supplement

## PLEDGE AGREEMENT

This Pledge Agreement (this "Agreement") is made and entered into as of the 22nd day of March 2022, by **BLT Restaurant Group LLC**, a New York limited liability company (the "Borrower" or "Pledgor") in favor of **JL Holdings 2002 LLC,** a Delaware limited liability company, or its assigns (the "Lender" or "Secured Party").

## RECITALS

**WHEREAS,** the Lender had previously made available to Borrower the principal amount of $5,000,000 or, if less, the aggregate unpaid amount of all Advances (the "Loan"), as set forth in that certain Amended and Restated Loan Agreement by and between Borrower and Lender, as amended, and in effect as of February 20, 2020 (the "Loan Agreement");

**WHEREAS,** the Borrower has secured all its obligations to Secured Party under the Loan evidenced by that certain Loan Agreement executed by Borrower and delivered to Secured Party;

**WHEREAS**, the Borrower owns interests or shares in the entities and owns rights to agreements on Schedule A and B attached hereto including all warrants, rights, stock dividends, proceeds and any other right attendant to the interests or shares or agreements listed on Schedule A and B and pursuant to the Pledge Agreement dated February 20, 2020 delivered the shares to Lender pursuant to the Pledge Agreement;

**WHEREAS**, Borrower and Lender executed a Second Amended and Restated Loan Agreement increasing the loan amount to Ten Million Dollars ($10,000,000) of which $7,831,000 remains outstanding as of March 18, 2022;

**WHEREAS**, on March 18, 2022 (the "Petition Date"), BLT Restaurant Group LLC a New York limited liability company (the "Debtor") commenced a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"; and the case commenced thereby, the "Chapter 11 Case"). The Debtor continues to operate its business and manage its property as debtor in position pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrower has requested Lender advance additional sums subsequent to the filing of Borrower's Chapter 11 Case and grant liens on the same collateral provided Pre-petition;

**WHEREAS**, the Lender agrees to provide the Borrower with a Facility Loan in an aggregate principal amount not to exceed Six Hundred Thousand and 00/100 DOLLARS ($600,000) on an interim basis subject to a final financing order to be entered by the Bankruptcy Court. The aggregate unpaid amount of the Loan and all Advances (as defined below) made by the Lender to the Borrower outstanding from time to time, shall be due and payable on the earlier of September 1, 2022 or the Effective Date of a Plan of Reorganization (the "Maturity Date"), together with interest on the unpaid principal balance at a rate equal 2.0% per annum. Interest on

1

this Loan shall accrue daily, be added to the principal in arrears and compounded annually on the last day of March each year. If the Loan is not paid in full on or prior to the Maturity Date, interest due for subsequent periods shall be computed at a rate equal to the Federal Short-Term Rate in effect for each such Interest Period and shall compound monthly.

**WHEREAS**, the Lender agrees to make the initial advance of One Hundred Thousand Dollars ($100,000) of the Loan to the Borrower upon Bankruptcy Court approval of the Interim DIP Financing and to make advances of the Loan from time to time (each an "Advance") to the Borrower upon request from the beginning date hereof and continuing through the earlier of September 1, 2022 or the Effective Date of the Plan. The sum of all Advances made under this Loan from time to time shall not exceed Six Hundred Thousand Dollars ($600,000).

**WHEREAS,** as a condition to entering into the Debtor in Possession Secured Loan Agreement, Secured Party requires Borrower to enter into this Pledge Agreement and to pledge to Secured Party all of Borrower's interests or shares in the entities and owns rights to agreements on Schedule A and B attached hereto including all warrants, rights, stock dividends, proceeds and any other right attendant to the interests or shares or agreements listed on Schedule A and B; and

**NOW, THEREFORE,** for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to induce Secured Party to enter into the Loan with Borrower, and intending to be legally bound, Pledgor hereby covenants and agrees with Secured Party as follows:

1.      Secured Obligations. This Agreement is given to secure the due and punctual payment and performance of all indebtedness and obligations of Pledgor to Secured Party under the Debtor in Possession Secured Loan Agreement, whether now existing or hereafter arising, and all costs of collection thereof (all of said debts, obligations and liabilities are hereinafter collectively referred to as the "Secured Obligations").

2.      Pledge and Security Interest.

(a)      The Pledgor hereby pledges and grants to Secured Party a security interest in the following:  Borrower's interests or shares in the entities  and owns rights to agreements on Schedule A and B attached hereto including all warrants, rights, stock dividends, proceeds and any other right attendant to the interests or shares or agreements listed on Schedule A and B which means the right to share in the profits and losses of all such entities and the right to share in distributions (the "Membership Interest"), together with all distributions of cash and all other property at any time and from time to time distributed in respect of the Membership Interest, and all proceeds thereof, whether now existing or at any time hereafter acquired or issued (collectively, the "Collateral").

(b)      Upon the request of Secured Party, Pledgor shall execute such financing statements and other documents, for filing or recording the same in all public offices deemed necessary or appropriate by Secured Party, and do such other acts and things as Secured Party may from time to time request, to establish and maintain a valid security interest in the Collateral, free

of all other liens and claims of every nature whatsoever. Secured Party shall have the right to file all financing statements and continuation statements with respect to the Collateral.

(c)    Pledgor hereby represents and warrants that the Membership Interests are uncertificated.

(d)    Pledgor hereby represents and warrants to Secured Party that Pledgor is the sole legal owner of the Collateral and holds full and absolute beneficial title to the Collateral, free and clear of all liens, charges, encumbrances, security interests, and voting restrictions of every kind and nature and that Pledgor has granted to Secured Party a security interest in the Collateral which is at the time hereof valid, perfected, and of the first priority under applicable law, and that no financing statement, security interest or other lien or encumbrance covering the Collateral or its proceeds is outstanding or on file in any public office.

(e)    Pledgor hereby represents and warrants to Secured Party that it has all requisite power and authority to enter into this Pledge Agreement, to pledge the Collateral, and to carry out the transactions contemplated by this Pledge Agreement.

3.    <u>Registration in Nominee Name</u>.  Secured Party shall have the right (in Secured Party's sole and absolute discretion) to hold any certificates representing the Collateral in the name of Pledgor endorsed or assigned in blank.

4.    <u>Covenants</u>.  Until such time as all of the Secured Obligations are paid in full, Pledgor covenants and agrees with Secured Party as follows:

(a)    Pledgor shall keep the Collateral free from all security interests, liens, levies, attachments, voting restrictions, and all other encumbrances, except for the interest of Secured Party herein granted;

(b)    Pledgor shall not assign, sell, transfer, deliver, or otherwise dispose of any of the Collateral or any interest therein without the express prior written consent of Secured Party, which consent may be withheld in the sole and absolute discretion of Secured Party; and

(c)    Pledgor shall pay all taxes, assessments, and all other charges of any nature which may be levied on or assessed against the Collateral or distributions in respect of the Collateral owned by the Pledgor.

5.    <u>Voting Rights; Distributions, etc.</u>

(a)    Unless and until an Event of Default hereunder has occurred:

(i)    Pledgor shall be entitled to exercise any and all voting and consensual rights and powers accruing to an owner of the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement; and

(ii)    Pledgor shall be entitled to receive and retain any and all cash distributions payable on the Collateral. Any and all liquidating dividends, other distribution in

3

property, return of capital or distribution made on or in respect of the Collateral shall be and become part of the Collateral pledged hereunder and, if received by Pledgor, shall forthwith be delivered to Secured Party to be held subject to the terms of this Agreement.

(b)    Upon the occurrence and during the continuance of any Event of Default, regardless of whether Secured Party makes any demand or request on Pledgor:

(i)    Pledgor shall deliver immediately to Secured Party any and all cash, checks, drafts, items or other instruments for the payment of money which may be received after such default by Pledgor as distributions or otherwise with respect to the Collateral, duly endorsed and assigned to Secured Party; and

(ii)    All rights of Pledgor to exercise the voting and consensual rights and powers which Pledgor is entitled to exercise pursuant to Section 5(a)(i) hereof shall cease, and all such rights shall thereupon become vested in Secured Party, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers.

6.    <u>Performance of Pledgor's Obligations</u>.  At Secured Party's option, Secured Party may (but shall not be obligated to) from time to time perform any agreement of Pledgor hereunder which Pledgor shall fail to perform, and may take any other reasonable action which Secured Party deems necessary for the maintenance or preservation of the value of the Collateral or Secured Party's interest therein, and any such cost so incurred shall immediately become due and payable by Pledgor and shall bear interest until paid at the default rate specified in the Note.

7.    <u>Attorney-in-Fact</u>.  Pledgor hereby irrevocably constitutes and appoints Secured Party as Pledgor's agent and attorney-in-fact for the purposes of carrying out the provisions of this Agreement and taking any action and executing any interest which Secured Party may deem necessary or advisable to accomplish the purposes hereof.  Without limiting the generality of the foregoing, Secured Party shall have the right and power to receive, endorse and collect all checks and other orders for the payment of money made payable to Pledgor representing any distribution payable in respect of the Collateral or any part thereof and give full discharge for the same, to the extent that Secured Party has any rights to such funds in accordance with this Agreement.  As Pledgor's attorney-in-fact, Secured Party shall have full power and authority to execute and deliver, in Pledgor's name or on Pledgor's behalf, any and all applications, certificates, endorsements, instruments and other documents of every nature which Secured Party at any time and from time to time shall reasonably deem necessary for the establishment and continuation of its perfected security interest in the Collateral or for the exercise of any of its rights and remedies herein provided with respect to the Collateral, including, but not limited to, any disposition of Collateral in the event of foreclosure.  In exercising the power of attorney herein granted, Secured Party may act by and through its authorized officers or any other designee.  The foregoing power of attorney is coupled with an interest, is irrevocable, and shall be terminated only upon payment in full of the Secured Obligations.

8.    <u>Events of Default</u>.  Pledgor shall be in default under this Agreement upon the occurrence of any one or more of the following events (hereinafter referred to as "<u>Events of Default</u>"): (i) any default shall occur in the payment of any sum when due under the Debtor In

4

Possession Secured Loan Agreement or any other default under the Debtor In Possession Secured Loan Agreement and/or DIP Loan Documents; (ii) the breach by Pledgor of any of the covenants set forth in Section 4 hereof; or (iii) any of the representations or warranties made by Pledgor in this Agreement shall prove to be false or misleading in any material respect.

9.     Rights and Remedies on Default. Upon the occurrence of an Event of Default under this Agreement and in addition to the rights set forth elsewhere herein, or available under applicable law, Secured Party may, in Secured Party's sole discretion and after giving written notice to Pledgor of such Event of Default, (i) declare all the Secured Obligations to be immediately due and payable, (ii) proceed immediately to exercise any and all of Pledgor's rights, powers and privileges with respect to the Collateral, including, without limitation, the right to sell or otherwise dispose of the Collateral, or any part thereof, at private or public sale in such manner as Secured Party shall deem reasonable, and (iii) exercise any other right or remedy available to Secured Party under the New York Uniform Commercial Code or otherwise available by any agreement or under applicable federal or state law. All rights and remedies herein specified are cumulative and are in addition to such other rights and remedies as may be available to Secured Party. Any requirement imposed by law regarding the giving to Pledgor of prior notice of any sale or other disposition of the Collateral shall be deemed reasonable if given by Secured Party in writing at least ten (10) days prior to such sale or other disposition specifying the time and place thereof.

It is specifically acknowledged and agreed by Pledgor that upon the occurrence of an Event of Default under this Agreement, Secured Party shall have the right to exercise all of the rights of Pledgor.

10.     Application of Proceeds. No disposition of any of the Collateral shall extinguish any of the Secured Obligations, except to the extent that the net proceeds are applied thereto, such proceeds to be applied first to the payment of all costs and expenses of collection and disposition of the Collateral (including, without limitation, reasonable attorneys' fees and expenses), and then toward payment of the Secured Obligations, in such order of application as Secured Party may from time to time elect, and any remaining balance paid to the Pledgor or other party lawfully entitled thereto.

11.     Term of Agreement. This Agreement shall terminate only upon the payment in full of all the Secured Obligations, at which time Secured Party shall reassign and deliver to Pledgor any Collateral. Such reassignment shall be without recourse upon or warranty by Secured Party.

12.     Miscellaneous.

(a)     Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed to have been effectively given when delivered in person or by recognized overnight delivery service to the following addresses, or to such other place or address as shall be designated in writing by any of the parties hereto:

If to Pledgor:               BLT Restaurant Group LLC

145 E 57th Street, 11th Floor
New York, NY 10022
Attn: James Haber CEO

If to Secured Party:        JL Holdings 2002 LLC
145 E 57th Street, 11th Floor
New York, NY 10022
Attn: John Huber, Secretary

With a copy to

(b)      Survival.  All representations, warranties, covenants and agreements herein contained shall survive the execution and delivery of this Agreement.

(c)      No Waiver.  No failure on the part of Secured Party to exercise, and no delay in exercising, any right, power or remedy granted hereunder, or available at law, in equity or otherwise, shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights, powers or remedies by Secured Party preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.  No waiver by Secured Party of any Event of Default shall constitute a waiver of any subsequent Event of Default.

(d)      Entire Agreement.      This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the Pledgor and Secured Party with respect to the subject matter hereof.

(e)      Amendments.  This Agreement may be amended only by written agreement among the parties hereto.

(f)      Time of Essence.  Time is of the essence under this Agreement.

(g)      Governing Law.  This Agreement and the construction and enforcement hereof shall be governed in all respects by the laws of the State of New York, without regard to principles of conflicts of law.

(h)      Successors and Assigns.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs and assigns, except that Pledgor shall not be permitted to assign its obligations under this Agreement or any interest herein or in

6

the Collateral, or any part thereof, or otherwise pledge, encumber or grant any options with respect to all or any of the Interests or other property held as Collateral under this Agreement.

(i)    Severability. If any provision of this Agreement or any portion thereof shall be invalid or unenforceable under applicable law, such part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of such provisions or other remaining provisions.

(j)    Further Assurances. Pledgor agrees to do such further acts, and to execute and deliver such additional conveyances, assignments, agreements and instruments with the administration and enforcement of this Agreement or relative to the Collateral or any part thereof, or in order to better assure and confirm to Secured Party its rights, powers and remedies hereunder.

(k)    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, and by facsimile or electronic signature, each of which shall be deemed to be an original and all of which, taken together, shall constitute one and the same instrument.

(l)    Headings.  The descriptive headings of the several paragraphs are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(m)    Cumulative Rights.  Each and every right granted to Secured Party under this Agreement, or under any other document delivered hereunder or in connection herewith or allowed it by law or in equity shall be cumulative and may be exercised from time to time.

(n)    Amendments to Limited Liability Agreement.  Pledgor further agrees that without the prior express written consent of the Secured Party, which may be withheld in its sole and absolute discretion, the Limited liability Company Agreements of ESquared Hospitality LLC and EESW LLC shall not be amended or otherwise modified in any respect which would be inconsistent with the terms of this Agreement or which would adversely affect any of the rights of the Secured Party hereunder.

(o)    Waiver of Jury Trial. PLEDGOR IRREVOCABLY WAIVES ANY AND ALL RIGHTS PLEDGOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.  PLEDGOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY. Pledgor further acknowledges that Pledgor has read and understood all the provisions of this Pledge Agreement, including this waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**IN WITNESS WHEREOF,** Pledgor has duly executed and delivered this Pledge Agreement as of the day and year first above written.

**PLEDGOR:**

BLT Restaurant Group LLC
By: JL Holdings Inc., Manager

_____

David Selinger, Treasurer

**SCHEDULE A**
**TO PLEDGE AGREEMENT**
**COLLATERAL – MEMBER INTERESTS**

### Wholly or Partly Owned by BLT Restaurant Group LLC

| Entity Name | Jurisdiction | Entity EIN | Percentage Owned |
|---|---|---|---|
| BLT Steak LLC | Delaware | 34-2028432 | 100% |
| BLT Steak Waikiki LLC | Delaware | 27-1243796 | 100% |
| BLT Burger DC LLC | Delaware | 80-0553361 | 100% |
| Casa Nonna NYC | New York | 27-2656285 | 100% |
| BLT Prime Lexington LLC | New York | 61-1907423 | 100% |
| E2 Development & Construction | New York | 61-1767468 | 100% |
| 101 West 57 Restaurant LLC | New York | 90-0810714 | 50% |
| BLT Steak White Plains LLC | New York | 26-0159421 | * |
| BLT Steak DC LLC | Delaware | 02-0758561 | 50% |

* Profits interest only.

### Managed by BLT Restaurant Group LLC **

| Entity Name | Jurisdiction | Entity EIN | Percentage Owned |
|---|---|---|---|
| BLT Steak Charlotte LLC | North Carolina | 27-0804110 | 0% |
| 151 W. Adams Restaurant LLC | Illinois | 27-1713271 | 0% |
| THC Miami Restaurant Hospitality LLC | Delaware | 37-1713081 | 0% |
| Trump Old Post Office LLC | Delaware | 45-2671841 | 0% |

** BLT Restaurant Group LLC ("BLT") is the Manager of these LLCs and derives compensation from services provided in such capacity. Neither BLT nor any affiliate of BLT holds an ownership position in any of these entities.

### Licensed by BLT Restaurant Group LLC***

| Entity Name | Percentage Owned |
|---|---|
| Casa Nonna - Aruba | 0% |
| BLT Steak - Aruba | 0% |
| BLT Steak - Hong Kong | 0% |
| BLT Steak - Osaka | 0% |
| BLT Steak - Ginza | 0% |
| BLT Steak - Seoul | 0% |
| BLT Steak - Las Vegas | 0% |
| BLT Steak - Tokyo (Roppongi) | 0% |
| BLT Burger - Hong Kong (Ocean Terminal) | 0% |

*** BLT has licensed Trademark names, concepts and other intellectual property (see Exhibit B) to these entities and receives license fees pursuant to such agreements. Neither BLT nor any affiliate of BLT holds an ownership position in any of these entities.

**SCHEDULE B**
**TO PLEDGE AGREEMENT**
**COLLATERAL – INTELLECTUAL PROPERTY**

**Ownership Of Trade Names and other Intellectual property \***

1   BLT Steak
2   BLT Prime
3   BLT Burger
4   The Wayfarer
5   The Florentine
6   Casa Nonna

\*Each of the above trade names and related intellectual property is owned by BLT Restaurant Group LLC. Related intellectual property associated with each trade name (the Trade Name Concept) includes (i) concepts, ambience, look and feel of restaurants operated under the trade name, including themes, ideas, logos, images, symbols, designs, visuals and other distinctive effects, (ii) menu and recipe items associated with the trade name, and (iii) methodology applied to the operation of a restaurant operating under the trade name.

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is dated as of March 22, 2022 by and between BLT Restaurant Group LLC, a New York limited liability company (the "Debtor") in favor of JL Holdings 2002 LLC, a Delaware limited liability company, or its assigns (the "Lender" or "Secured Party").

## BACKGROUND

A.    Pursuant to a certain Debtor in Possession Loan Agreement dated March 22, 2022, Debtor has the ability to borrow up to a principal amount of, and not to exceed, Six Hundred Thousand Dollars ($600,000).

B.    Debtor owns personal property as well as member and shareholder interests in entities and agreements attached hereto as Exhibits A and B.

C.    It is a condition precedent to Secured Party's acceptance of the Debtor in Possession Loan Agreement that Debtor executes and delivers to Secured Party a security agreement in substantially the form hereof.

D.    Debtor desires to grant a security interest in its all of its current assets and future assets in favor of Secured Party subject only to the existing liens of Lender.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Definitions.

1.1    All initially capitalized terms used herein without definitions shall have the respective meanings provided therefor in the Debtor in Possession Loan Agreement.

1.2    The term "State", as used herein, means the State of New York.

1.3    All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions herein as specified therein.

1.4    The term Debtor herein shall refer to Debtor and shall include all or any of the Debtor as the context may require.

2.    Grant of Security Interest.  Debtor hereby grants to Secured Party, to secure the payment and performance in full of all of the obligations under the Debtor in Possession Loan Loan Agreement, this Agreement and the other Collateral Documents (collectively, the "Obligations'), a security interest in and so pledges and assigns to Secured Party the following properties, all of Debtor's property including cash, accounts, goods, inventory, equipment, general intangibles and all other manner and type of personal property, including a pledge of all

1

of the member interests that Borrower owns or may own in the future of any entity or agreements including but not limited to the right, title and interest in the entities and agreements on Exhibits A and B and all intellectual property, trademarks, patents, copyrights and goodwill, including but not limited to those listed on Schedule B and all proceeds, income, dividends or distributions therefrom and all proceeds or products of any of the foregoing hereto including all warrants, rights, stock dividends, proceeds and any other right attendant to the Shares, and all other assets and rights, of Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of Debtor, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, and any other contract rights or rights to the payment of money.

3.      Authorization to File Financing Statements. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that, (a) describe the Collateral (i) as accounts and proceeds thereof or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Debtor is an organization, the type of organization and any organization identification number issued to Debtor.

4.      Other Actions. Further to insure the attachment, perfection and priority of, and the ability of Secured Party to enforce, Secured Party's security interest in the Collateral, so long as any Obligations remain outstanding, Debtor agrees, in each case at Debtor's own expense, to take the following actions with respect to the following Collateral:

4.1      Promissory Notes and Tangible Chattel Paper. If Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper, Debtor shall forthwith endorse, assign and deliver the same to Secured Party, accompanied by such instruments of transfer or

assignment duly executed in blank as Secured Party may from time to time specify, and all payments and proceeds of any such notes or chattel paper shall be applied to the Obligations as Secured Party shall determine in its sole discretion.

4.2    Deposit Accounts.  For each deposit account that Debtor at any time opens or maintains, Debtor shall, at Secured Party's request and option, pursuant to an agreement, in form and substance satisfactory to Secured Party, and subject to the provisions of the following sentence, either (a) cause the depositary bank to agree to comply at any time with instructions from Secured Party to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Debtor, or (b) arrange for Secured Party to become the customer of the depositary bank with respect to the deposit account, with Debtor being permitted, only with the consent of Secured Party, to exercise rights to withdraw funds from such deposit account.  Secured Party shall not give any such instructions or withhold any withdrawal rights from Debtor, unless an Event of Default has occurred or, after giving effect to any withdrawal not otherwise permitted by the Amended and Restated Loan and Security Agreement, this Agreement or any of the other Collateral Documents, would occur. The provisions of this paragraph shall not apply to (i) any deposit account for which Debtor, the depositary bank and Secured Party have entered into a cash collateral agreement specially negotiated among Debtor, the depositary bank and Secured Party for the specific purpose set forth therein, (ii) deposit accounts for which Secured Party is the depositary and (iii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Debtor's salaried employees.

4.3    Electronic Chattel Paper and Transferable Records.  If Debtor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, Debtor shall promptly notify Secured Party thereof and, at the request of Secured Party, shall take such action as Secured Party may reasonably request to vest in Secured Party control, under Section 9-105 of the Uniform Commercial Code, of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.  Secured Party agrees with Debtor that Secured Party will arrange, pursuant to procedures satisfactory to Secured Party and so long as such procedures will not result in Secured Party's loss of control, for Debtor to make alterations to the electronic chattel paper or transferable record permitted under UCC §9-105 or, as the case may be, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or §16 of the Uniform Electronic Transactions Act for a party in control to make without loss of control, unless an Event of Default has occurred or would occur after taking into account any action by Debtor with respect to such electronic chattel paper or transferable record.

5.    Intentionally Omitted.

6.    Representations and Warranties Concerning Debtor's Legal Status.  Debtor represents and warrants to Secured Party that all information including Debtor's exact legal name, type of organization, jurisdiction of organization, and address of its chief executive office

are as set forth on Schedule A hereto.

7.      Covenants Concerning Debtor's Legal Status.  Debtor covenants with Secured Party as follows: (a) without providing at least 30 days' prior written notice to Secured Party, Debtor shall not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, (b) if Debtor does not have an organizational identification number and later, obtains one, Debtor shall forthwith notify Secured Party of such organizational identification number, and (c) Debtor will not change its type of organization, jurisdiction of organization or other legal structure.

8.      Representations and Warranties Concerning Collateral, Etc.  Debtor further represents and warrants to Secured Party as follows: (a) Debtor is the owner of the Collateral, free from any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement, subject only to the existing liens of Lender, (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in §9-102(a)(34) of the Uniform Commercial Code of the State, and (c) Debtor holds no commercial tort claim except as indicated on Schedule A.

9.      Covenants Concerning Collateral, Etc.  Debtor further covenants with Secured Party as follows: (a) the Collateral, to the extent not delivered to Secured Party pursuant to Section 4, will be kept at those locations listed on Schedule A and Debtor will not remove the Collateral from such locations, without providing at least 30 days' prior written notice to Secured Party, (b) except for the security interest herein granted, Debtor shall be the owner of the Collateral free from any lien, security interest or other encumbrance, and Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Secured Party, (c) Debtor shall not pledge, mortgage or create, or suffer to exist a security interest in its respective Collateral in favor of any person other than Secured Party except for liens permitted by the Amended and Restated Loan and Security Agreement, this Agreement and the other Collateral Documents, (d) Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, (e) Debtor will permit Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located, (f) Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, (g) Debtor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances, and (h) Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest.

10.     Insurance.

10.1    Maintenance of Insurance.  Debtor shall maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such

minimum amounts that Debtor will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to Secured Party. In addition, all such insurance shall be payable to Secured Party as loss payee under a standard loss payee clause. Without limiting the foregoing, Debtor shall (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law, and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of Debtor; business interruption insurance; and product liability insurance.

10.2    Insurance Proceeds. The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with a prior interest in the property covered thereby, (i) so long as no Event of Default has occurred and to the extent that the amount of such proceeds is less than the amount to be disbursed to Debtor for direct application by Debtor solely to the repair or replacement of Debtor's property so damaged or destroyed and (ii) in all other circumstances, be held by Secured Party as cash collateral for the Obligations. Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions, as Secured Party may reasonably prescribe, for direct application by Debtor solely to the repair or replacement of Debtor's property so damaged or destroyed, or Secured Party may apply all or any part of such proceeds to the Obligations.

10.3    Notice of Cancellation, etc. All policies of insurance shall provide for at least 30 days prior written cancellation notice to Secured Party. In the event of failure by Debtor to provide and maintain insurance as herein provided, Secured Party may, at its option, provide such insurance and charge the amount thereof to Debtor. Debtor shall furnish Secured Party with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

11.    Collateral Protection Expenses: Preservation of Collateral.

11.1    Expenses Incurred by Secured Party. In its discretion, Secured Party may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or, if Debtor fails to do so, insurance premiums. Debtor shall reimburse Secured Party on demand for any and all expenditures so made. Secured Party shall have no obligation to Debtor to make any such expenditures, nor shall the making thereof relieve Debtor of any default hereunder.

11.2    Secured Party's Obligations and Duties. Anything herein to the contrary notwithstanding, Debtor shall remain liable under each contract or agreement comprised in the Collateral to be observed or performed by Debtor thereunder. Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this

Agreement or the receipt by Secured Party of any payment relating to any of the Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Secured Party or to which Secured Party may be entitled at any time or times. Secured Party's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Uniform Commercial Code of the State or otherwise, shall be to deal with such Collateral in the same manner as Secured Party deals with similar property for its own account.

12.    Securities and Deposits. Secured Party may at any time following Default or Event of Default, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations. Whether or not any of the Obligations are due, Secured Party may, following an Event of Default, demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from Secured Party to Debtor may at any time be applied to or set off against any of the Obligations then due and owing.

13.    Notification to Account Debtor and Other Persons Obligated on Collateral. If a Default or an Event of Default shall have occurred, Debtor shall, at the request of Secured Party, notify account Debtor and other persons obligated on any of the Collateral of the security interest of Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to Secured Party or to any financial institution designated by Secured Party as Secured Party's agent therefor, and Secured Party may itself if a Default or Event  of Default shall have occurred, without notice to or demand upon Debtor, so notify account Debtor and other persons obligated on Collateral. After the making of such a request or the giving of any such notification, Debtor shall hold any proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Debtor as trustee for Secured Party without commingling the same with other funds of Debtor and shall turn the same over to Secured Party in the identical form received, together with any necessary endorsements or assignments. Secured Party shall apply the proceeds of collection of accounts, chattel paper, general intangibles, instruments and other Collateral received by Secured Party to the Obligations, such proceeds to be immediately entered after final payment in cash or other immediately available funds of the items giving rise to them.

14.    Power of Attorney.

14.1    Appointment and Powers of Secured Party. Subject to the terms of the Plan, Debtor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Debtor or in Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate

action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of Debtor, without notice to or assent by Debtor, to do the following:

(a)    upon the occurrence of a Default or Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral in such manner as is consistent with the Uniform Commercial Code of the State and as fully and completely as though Secured Party were the absolute owner thereof for all purposes, and to do at Debtor's expense, at any time, or from time to time, all acts and things which Secured Party deems necessary to protect, preserve or realize upon the Collateral and Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as Debtor might do, including, without limitation, (i) the filing and prosecuting of registration and transfer applications with the appropriate federal or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes, (ii) upon written notice to Debtor, the exercise of voting rights with respect to voting securities, which rights may be exercised, if Secured Party so elects, with a view to causing the liquidation in a commercially reasonable manner of assets of the issuer of any such securities, and (iii) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral; and

(b)    to the extent that Debtor's authorization given in Section 3 is not sufficient, to file such financing statements with respect hereto, with or without Debtor's signature, or a photocopy of this Agreement in substitution for a financing statement, as Secured Party may deem appropriate and to execute in Debtor's name such financing statements and amendments thereto and continuation statements which may require Debtor's signature.

14.2    Ratification by Debtor. To the extent permitted by law, Debtor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

14.3    No Duty on Secured Party. The powers conferred on Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Debtor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

15.    Remedies. If an Event of Default shall have occurred, Secured Party may, without notice to or demand upon Debtor, declare this Agreement to be in default, and Secured Party shall thereafter have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State or of any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose Secured Party may, so far as Debtor can give authority therefor, enter upon any premises on which the

Collateral may be situated and remove the same therefrom.  Secured Party may in its discretion require Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Debtor's principal office(s) or at such other locations as Secured Party may reasonably designate.  Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party shall give to Debtor at least five Business Days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made.  Debtor hereby acknowledges that five Business Days' prior written notice of such sale or sales shall be reasonable notice.  In addition, Debtor waives any and all rights that, it may have to a judicial hearing in advance of the enforcement of any of Secured Party's rights hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

16.    Standards for Exercising Remedies.  To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (a) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account Debtor or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account Debtor and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of any Collateral in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure Secured Party against risks of loss, collection or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection. or disposition of any of the Collateral.  Debtor acknowledges that the purpose of this Section 16 is to provide non-exhaustive indications of what actions or omissions by Secured Party would not be commercially unreasonable in Secured Party's exercise of remedies against the Collateral and that other actions or omissions by Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 16. Without limitation upon the foregoing, nothing contained in this Section 16 shall be construed to grant any rights to Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence

of this Section 16.

17.     No Waiver by Secured Party, etc.  Secured Party shall not be deemed to have waived any of its rights upon or under the Obligations or the Collateral unless such waiver shall be in writing and signed by Secured Party.  No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion.  All rights and remedies of Secured Party with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Secured Party deems expedient.

18.     Suretyship Waivers by Debtor.  Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description.  With respect to both the Obligations and the Collateral, Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Secured Party may deem advisable.  Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in Section 11.2.  Debtor further waives any and all other suretyship defenses.

19.     Marshaling.  Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that it lawfully may do so, Debtor hereby agrees that it will not invoke any law relating to the marshalling of Collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Debtor hereby irrevocably waives the benefits of all such laws.

20.     Proceeds of Dispositions; Expenses.  Debtor shall pay to Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Secured Party in protecting, preserving or enforcing Secured Party's rights under or in respect of any of the Obligations or any of the Collateral.  After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as Secured Party may determine, proper allowance and provision being made for any

Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to Debtor, and Debtor shall remain liable for any deficiency in the payment of the Obligations.

21.    Overdue Amounts.  Until paid, all amounts due and payable by Debtor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the Default Rate.

22.    Notices.  All communications required under this Agreement shall be in writing, and shall be sent by certified mail, postage prepaid, return receipt requested, or telegraph, addressed, as following or to such other address as the addressee may designate in writing in the manner provided herein:

            If to Debtor:

            BLT Restaurant Group LLC
            145 E 57th Street, 11th Floor
            New York, NY 10022
            Attn: James Haber, CEO


            JL Holdings 2002 LLC
            145 E 57th Street, 11th Floor
            New York, NY 10022
            Attn: John Huber, Secretary

23.    Governing Law.  THIS AGREEMENT IS INTENDED TO TAKE EFFECT AS A SEALED INSTRUMENT AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  This Agreement shall be construed without the aid of any canon, custom or rule of law requiring construction against the draftsman.

24.    Consent to Jurisdiction, Service and Venue.  Debtor hereby consents to the jurisdiction and venue of the courts of the State of New York or of any federal court located in such state, waive personal service of any and all process upon it and consents that all such service of process be made by certified or registered mail directed to Debtor at its chief executive office as specified on Schedule A hereto and service so made shall be deemed to be completed upon actual receipt or execution of a receipt by any Person at such address. Debtor hereby waives the right to contest the jurisdiction and venue of the courts located in the State of New York on the ground of inconvenience or otherwise and, further, waives any right to bring any action or proceeding against Secured Party in any court outside the State of New York or against

any the Lender other than in a State within the United States designated by such Lender. The provisions of this Section 24 shall not limit or otherwise affect the right of Secured Party to institute and conduct an action in any other appropriate manner, jurisdiction or court.

25.     WAIVER OF JURY TRIAL; DAMAGES. DEBTOR AND SECURED PARTY (BY ACCEPTANCE OF THIS AGREEMENT) MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF SECURED PARTY OR THE LENDERS RELATING TO THE ADMINISTRATION OF THE LOANS OR ENFORCEMENT OF THIS AGREEMENT, AND AGREE THAT NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITEDBY LAW, DEBTOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR SECURED PARTY AND THE LENDERS TO ACCEPT THIS AGREEMENT AND MAKE THE LOANS.  EACH PARTY TO THIS AGREEMENT (I) CERTIFIES THAT NEITHER SECURED PARTY NOR ANY LENDER NOR ANY REPRESENTATIVE, OR ATTORNEY OF SECURED PARTY OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY OR THE LENDERS WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND (II) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 25. THE PROVISIONS OF THIS SECTION 25 HAVE BEEN FULLY DISCLOSED TO THE PARTIES AND THE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS.  NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION 25 WILL NOT BEFULLY ENFORCED IN ALL INSTANCES.

26.     Miscellaneous.

26.1     The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof.

26.2     This Agreement and all rights and obligations hereunder shall be binding upon Debtor and its successors and assigns and shall inure to the benefit of Secured Party and its successors and assigns.

26.3     If any term of this Agreement shall be held to be invalid, illegal or

unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein.

26.4    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

26.5    This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing.

26.6    Debtor acknowledges receipt of a copy of this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, intending to be legally bound, Debtor has caused this Security Agreement to be duly executed as of the date first above written.

BLT Restaurant Group LLC

By: JL Holdings Inc., Manager

_____

David Selinger, Treasurer

Accepted:

JL Holdings 2002 LLC

By: JL Holdings Inc., Manager

_____

John Huber, Secretary

**SCHEDULE A**
**TO SECURITY AGREEMENT**

## DEBTOR INFORMATION

Debtor's form of organization:

    Limited Liability Company

Debtor's state of organization:

    Delaware

Address of Debtor's chief executive office:

    950 Third Avenue, 22nd Floor
    New York, NY 10022

Debtor's EIN:

    20-1823199

Addresses of Collateral locations:

    950 Third Avenue, 22nd Floor
    New York, NY 10022

14

## COLLATERAL – MEMBER INTERESTS
### Wholly or Partly Owned by BLT Restaurant Group LLC

| Entity Name | Jurisdiction | Entity EIN | Percentage Owned |
|---|---|---|---|
| BLT Steak LLC | Delaware | 34-2028432 | 100% |
| BLT Steak Waikiki LLC | Delaware | 27-1243796 | 100% |
| BLT Burger DC LLC | Delaware | 80-0553361 | 100% |
| Casa Nonna NYC | New York | 27-2656285 | 100% |
| BLT Prime Lexington LLC | New York | 61-1907423 | 100% |
| E2 Development & Construction | New York | 61-1767468 | 100% |
| 101 West 57 Restaurant LLC | New York | 90-0810714 | 50% |
| BLT Steak White Plains LLC | New York | 26-0159421 | * |
| BLT Steak DC LLC | Delaware | 02-0758561 | 50% |

\* Profits interest only.

### Managed by BLT Restaurant Group LLC **

| Entity Name | Jurisdiction | Entity EIN | Percentage Owned |
|---|---|---|---|
| BLT Steak Charlotte LLC | North Carolina | 27-0804110 | 0% |
| 151 W. Adams Restaurant LLC | Illinois | 27-1713271 | 0% |
| THC Miami Restaurant Hospitality LLC | Delaware | 37-1713081 | 0% |
| Trump Old Post Office LLC | Delaware | 45-2671841 | 0% |

\*\* BLT Restaurant Group LLC ("BLT") is the Manager of these LLCs and derives compensation from services provided in such capacity. Neither BLT nor any affiliate of BLT holds an ownership position in any of these entities.

### Licensed by BLT Restaurant Group LLC***

| Entity Name | Percentage Owned |
|---|---|
| Casa Nonna - Aruba | 0% |
| BLT Steak - Aruba | 0% |
| BLT Steak - Hong Kong | 0% |
| BLT Steak - Osaka | 0% |
| BLT Steak - Ginza | 0% |
| BLT Steak - Seoul | 0% |
| BLT Steak - Las Vegas | 0% |
| BLT Steak - Tokyo (Roppongi) | 0% |
| BLT Burger - Hong Kong (Ocean Terminal) | 0% |

\*\*\* BLT has licensed Trademark names, concepts and other intellectual property (see Exhibit B) to these entities and receives license fees pursuant to such agreements. Neither BLT nor any affiliate of BLT holds an ownership position in any of these entities.

**SCHEDULE B**
**TO SECURITY AGREEMENT**
**COLLATERAL – INTELLECTUAL PROPERTY**

## Ownership Of Trade Names and other Intellectual property *

1  BLT Steak
2  BLT Prime
3  BLT Burger
4  The Wayfarer
5  The Florentine
6  Casa Nonna

*Each of the above trade names and related intellectual property is owned by BLT Restaurant Group LLC. Related intellectual property associated with each trade name (the Trade Name Concept) includes (i) concepts, ambience, look and feel of restaurants operated under the trade name, including themes, ideas, logos, images, symbols, designs, visuals and other distinctive effects, (ii) menu and recipe items associated with the trade name, and (iii) methodology applied to the operation of a restaurant operating under the trade name.