UNITED STATES BANKRUPTCY COURT  　　　　Hearing Date and Time:
SOUTHERN DISTRICT OF NEW YORK  　　　　April 28, 2022 at 10:00 a.m.
-------------------------------------------------------------x
In re:  　　　　　　　　　　　　　　　　　　Chapter 11

BLT Restaurant Group LLC,  　　　　　　　　Case No. 22-10335 (LGB)

　　　　　　　　　　　Debtor.
-------------------------------------------------------------x

## SEXUAL HARASSMENT CLAIMANTS'
## OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT

Elliott Welburn, Miguel Torres and Alexis Manso (collectively, the "Sexual Harassment Claimants"), as and for their Objection to the motion filed by BLT Restaurant Group (the "Debtor") for approval of the Debtor's Disclosure Statement (ECF No. 7) (the "Disclosure Statement") filed in support of the Debtor's Plan of Reorganization (ECF No. 6) (the "Plan"), respectfully states and alleges as follows:

### Preliminary Statement

1.　　While the genesis of this Chapter 11 filing may be driven by the effects of the Covid-19 pandemic, one must wonder why the parent company alone filed a petition in bankruptcy without the operating subsidiaries following suit. Especially given the timing of the filing herein, Debtor may be motivated by a desire to blunt the claims of the Sexual Harassment Claimants, who are hardly mentioned in the bankruptcy filings, although their claims are significant. Indeed, the Sexual Harassment Claimants have already been awarded summary judgment as to liability pursuant to a comprehensive decision by the Hon. Peter B. Skelos (Ret'd.) in connection with an agreed arbitration before National Arbitration and Mediation ("NAM"). A copy of the decision on liability is annexed hereto as Exhibit "A".

2.　　The Sexual Harassment Claimants each assert claims of $2,260,000 for emotional duress based upon prevailing criteria and applicable caselaw, and $1,207,000 in punitive

damages. The damages are supported by an expert analysis. The Sexual Harassment Claimants make up three of the five unsecured creditors scheduled by the Debtor. Accordingly, the Sexual Harassment Claimants control the class of general unsecured creditors for purposes of voting on the Plan[1].

3.  However, the Plan and Disclosure Statement were filed without any negotiations with the Sexual Harassment Claimants and without meaningful opportunity for investigation into and evaluation of the Debtor's core financial affairs. The rush to file of a plan is exacerbated by the dearth of meaningful operating information, projections and valuations in the Disclosure Statement, which is a paradigm of overgeneralization. The Disclosure Statement contains only three pages of specific information among thirty additional pages which either repeat Plan provisions virtually verbatim or contain boiler-plate language concerning the confirmation process.

4.  Fundamentally, the Disclosure Statement also lacks transparency, if not being actively misleading, by failing to mention that the purported secured creditor, JL Holdings 2002 LLC (the "Insider Lender"), who is being paid 100% plus interest under the plan while unsecured creditors receive only a paltry 4% dividend, holds a 99.9% membership interest in the Debtor. Furthermore, during the Arbitration, Debtor produced tax filings which indicate that the Inside Lender is not be the Debtor's only member, as Justin Haber, Lily Haber, and Samantha Haber are all listed on the Debtor's 2019 and 2020 taxes as members, each with 100% ownership interest. None of these individuals were mentioned in the Local Rule 1007-2 Affidavit, the

---

[1] It is noteworthy that in the Schedules, the Debtor named the Sexual Harassment Claimants as a single creditor, in an obvious effort to temper their voting power. The Sexual Harassment Claimants are three separate unsecured creditors and are each entitled to a separate vote on the Plan.

Statement of Financial Affairs (which requires all current and former members to be identified); or the Disclosure Statement, which is completely silent as to the Debtor's membership.

5. There is no explanation as to the source of the funding for this purported secured loan, the actual recipient and disposition of the funds, and why the loan should not be recharacterized as a capital contribution or otherwise subordinated to non-insider creditors. That insiders filed a UCC-1 financing statement does not elevate their claim's priority, and the Disclosure Statement cannot possibly be approved without a clear and comprehensive discussion as to all of the particulars relating to this alleged secured claim. Furthermore, there is no transparency as to the identity of the Insider Lender's members, despite the fact that the name of JL Holdings 2002 incorporate the initials of the first names of two Habers, Justin and Lily, who are appear to be member of the Debtor.

6. Further information concerning the corporate structure of the Debtor is also lacking. The Debtor is said to own nine restaurants, five of which have closed. None of the closed restaurants are identified. The Debtor is said to own only 75% of one of the remaining locations, but no information is provided about the other member. The Debtor alleges to have management agreements with four other "BLT" entities, but there is no disclosure of their relationship with the Debtor, the terms of the agreements, or the income being generated by these agreements. Eight additional entities operating overseas restaurants which appear to be affiliates of the Debtor are referenced in the Debtor's Schedule "G", but none of these entities is even mentioned in the Disclosure Statement.

7. The Disclosure Statement is also completely devoid of any basic financial information relating to the Debtor and the operating subsidiaries, notwithstanding the

3

requirements of Bankruptcy Rule 2015.3 that detailed financial reporting be filed for each non-debtor subsidiary even before the Section 341 meeting is conducted.

8.   There is no liquidation analysis or statement of cash flow or profit and loss statements (either historical or projections for the life of the Plan), despite the Plan being based on future profits from operations, nor does the Debtor provide any information relating to payments to insiders for salaries, distributions, benefits or other consideration. These deficiencies go the heart of what is required for a proper disclosure statement.

### The Disclosure Statement Cannot Possibly Be Approved

**A.   Approval of the Disclosure Statement Generally**

9.   Pursuant to Section 1125 of the Bankruptcy Code, a debtor-in-possession must provide creditors with "adequate information" to make an informed decision on the Plan. In this regard, Section 1125(a)(1) provides:

> '[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan. . . .

11 U.S.C. §1125(a)(1). *See, e.g., In re PC Liquidation Corp.*, 383 B.R. 856, 866 (E.D.N.Y. 2008); *see also, In re Worldcom, Inc.*, 2003 WL 21498904 *10 (S.D.N.Y. Jun. 30, 2003) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court", *quoting In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (S.D.N.Y. 1995); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement 'that would enable a hypothetical reasonable investor typical of claims or interests of the relevant

4

class to make an informed judgment about the plan.'" (*quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977), 1998 U.S. Code Cong. & Admin News. 5787, 6364)).

10. Here, the Debtor falls far short of making the disclosures necessary for creditors to evaluate the Plan. At a minimum, the following information must be disclosed:

- Current Balance sheets for the Debtor and each of the subsidiaries, with footnotes relating to valuations

- Two years of profit and loss statements for the Debtor and each of the subsidiaries

- Projections for the Debtor and each of the operating subsidiaries for the length of the Plan

- Liquidation analysis for the Debtor and each of the operating subsidiaries

- Statement of personal property, chattels, and leases owned by the Debtor and each of the operating subsidiaries

- Appraisals and valuations of the Debtor and its assets based upon enterprise value

- List of all members, managers, directors or officers of the Debtor and each of the subsidiaries, together with their duties and salaries

- Summary of management agreements with both foreign and domestic entities, including relationship of the entity to the Debtor, term, monthly payments due to Debtor and projected monthly expenses of the Debtor

- Summary of store leases for the Debtor and the operating subsidiaries, including rent, additional rent, security deposits, term, relationship between the Debtor and the lessor

- Detailed information concerning the alleged secured loan from the Insider Lender, including the source of the funds, the disposition of the funds, payment terms, list of all payments made by the Debtor to the Insider Lender

- Statement of all salaries, distributions, benefits and other compensation paid and received by any of the members, managers, directors or officers of the Debtor and its subsidiaries for the two years prior to the Petition Date

- Detailed statement of the disposition of the Debtor's use of the funds from PPP loans

5

**B.     The Debtor Failed to Adequately Document the Sources of its Plan Funding**

11.     Besides the myriad of deficiencies set forth below, the Disclosure Statement fails to provide any useful information to evaluate the status of the business or the sources of the Debtor's income. The Debtor operates a chain of restaurants, of which five closed prior to the Chapter 11 filing, while four continue to operate. No information is given as to the basis on which the decisions were made to close particular restaurants and maintain others. The Disclosure Statement also fails to provide information as to the disposition of the assets of the closed restaurants or the resolution of claims arising from the failed operations.

12.     Of the four restaurants remaining open, the Debtor apparently owns only a 75% membership interest in one entity, BLT Steak DC LLC, although no disclosure is made as to who holds the other 25%, whether that entity has any personal liability for the Debtor's debts to creditors, or what the 25% member's role is in managing the Debtor as a whole, or BLT Steak DC LLC itself. The Debtor's schedules list two other entities in which the Debtor holds ownership interests, BLT LA LLC (20%) and Tavern 62 LLC (5%), neither of which is even mentioned in the Disclosure Statement.

13.     Moreover, notwithstanding that the Plan provides for payments to unsecured creditors over two years and the Insider Lender over ten years, no projections of future income or financial information concerning past performance are made. There is no discussion of the financial wherewithal of the remaining stores to support current operations let alone future Plan payments. There are no general statements of annual income and expenses.

14.     Moreover, the Disclosure Statement references another four "BLT" entities which are subject to "management agreements". No details are provided concerning the ownership of these entities, the terms of the management agreements, or the financial wherewithal of these

entities to meet their financial obligations to the Debtor for the management services being provided, notwithstanding that the profits from the management agreements appear to be a prime source for the income which will be used to fund the Plan. Indeed, the Statement of Financial Affairs lists income from "license/management agreements" as the sole source of funds for the Debtor in 2020, 2021 and year to date in 2022, with no receipts from the operation of the restaurants. This discrepancy is not addressed in the Disclosure Statement.

15. In addition to these management agreements, the Debtor's Schedule "G", filed after the Disclosure Statement, lists unspecified contracts which also appear to be management agreements between the Debtor and eight "BLT" entities located in Aruba, Bermuda, Japan, and Turks and Caicos, none of which are mentioned in the Disclosure Statement. More surprisingly, none of the management agreements are referenced in the Plan provisions regarding the assumption and rejection of executory contracts, or in the Disclosure Statement discussion of Section 365.

16. Indeed, only one lease, apparently covering the Debtor's office, is listed in Schedule "G" and referenced in the Plan, leaving the reader to guess how the four active restaurants pay rent, and whether there are any landlord claims for unpaid future rent arising from the five closed restaurants.

17. There is no liquidation analysis supporting the Debtor's conclusory statement that the amount of secured claim held by the Insider Lender is greater than the value of the Debtor's assets. The schedules list physical assets having a value of only $9,200, despite the Debtor continuing to operate 4 restaurants. Upon information and belief, the Debtor's 2020 tax return shows an investment of more than $600,000 in hard assets, none of which appears in the either Debtor's Schedules or Disclosure Statement.

18. There are no detailed financial reports or profit and loss statements either showing past performance or future projections to support feasibility or satisfy the best interests test. No information is provided concerning the income from the management agreements, even to reference the bare-bones numbers in the Statement of Financial Affairs. Importantly, the Debtor fails to disclose whether those agreements were negotiated at arms-length and contain customary terms in the industry or are "sweetheart" contracts with insiders.

19. In addition to withholding information concerning the Insider Lender, the Disclosure Statement also fails to discuss whether there are any intercompany loans or guaranties, or potentially voidable insider transfers under Chapter 5 of the Bankruptcy Code. Also of note in this regard are the annual salaries of $380,000 paid to three insiders that are listed in the Statement of Financial Affairs, but never referenced in the Disclosure Statement. Nor is any information provided as to whether additional remuneration is received from any of the subsidiaries.

20. The Disclosure Statement is also utterly devoid of information concerning the creditors. Not only did the Debtor fail to disclose the fact that the Insider Lender owns virtually all of the Debtor's membership interest, but there is no discussion whatsoever of whether grounds exist to recharacterize or subordinate the secured claim of the Insider Lender, either under Section 510 of the Bankruptcy Code, or by reason of the so-called loans being disguised capital contributions by an insider. *See, e.g., In re Interstate Cigar Co., Inc.*, 182 B.R. 675 (Bankr. E.D.N.Y. 1995), *subsequently aff'd sub nom. Interstate Cigar Co. v. Bambu Sales, Inc.*, 166 F.3d 1200 (2d Cir. 1998) (finding that a claim for repayment of cash advances which insider affiliate had made at time when debtor was insolvent was claim for return of "capital

8

contributions" and not for repayment of "loans," and would be subordinated to claims of debtor's general unsecured creditors)

21. The Debtor has scheduled five general unsecured creditors, a PPP loan in the amount of approximately $1,300,000, an unliquidated debt owed to an entity named Norvin 1301 CT LLC, and the Sexual Harassment Claimants, who have asserted combined claims in excess of $10 million. The Disclosure Statement estimates the total unsecured creditor body at only $2.3 million without any discussion whatsoever of how this figure was reached.

22. As noted, the claims asserted by the Sexual Harassment Claimants are already fixed as to liability. The Sexual Harassment Claimants were employed at the Wayfarer Restaurant, which was owned by 101 West 57 Restaurant LLC, one of the "Closed Entities" owned by the Debtor. They each asserted claims for sexual harassment which were allowed against 101 West 57 Restaurant LLC as the employer and against the Debtor and ESquared Hospitality LLC as the owners of 101 West 57 Restaurant LLC. A hearing before National Arbitration and Mediation on damages was stayed by the Chapter 11 filing. The Debtor does not devote even a single sentence to these claims.

23. The other unsecured creditors are also given short shrift. No information whatsoever is provided about Norvin 1301 CT LLC. The Debtor acknowledges that it borrowed a total of $3,289,500 in PPP funds under the CARE program established by the Federal Government for Covid-19 relief, of which some $2 million has been forgiven and $1.3 million is not being forgiven. The Debtor fails to state why the Government has rejected the Debtor's request to forgive the remaining claim and provides no information as to whether the Debtor complied with the PPP requirements for the use of the funds or might potentially be the subject of an action for fraud.

9

24.     In light of all of these deficiencies, the Sexual Harassment Claimants will not support the Plan.  In the absence of the consent of an impaired class of non-insiders, the Plan cannot be confirmed.  Thus, the Bankruptcy Court may refuse to approve the Disclosure Statement because the Plan is fundamentally flawed, rendering solicitation of ballots futile.  *See*, *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd sub nom. In re Washington Assocs.*, 147 B.R. 827 (E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation."); *In re Quigley Co.*, 377 B.R. 110, 115-116 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re 18 RVC, LLC*, 485 B.R. 492 (Bankr. E.D.N.Y. 2012); *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017).

25.     In sum, there are serious (and likely fatal) deficiencies in both the Plan and Disclosure Statement which should be addressed immediately so as to not prolong a futile process.

**WHEREFORE**, the Court should deny approval of the Disclosure Statement for all of the reasons set forth above.

Dated:  New York, New York
        April 21, 2022

                                    GOLDBERG WEPRIN
                                    FINKEL GOLDSTEIN, LLP
                                    Attorneys for the Sexual Harassment Claimants
                                    1501 Broadway, 22nd Floor
                                    New York, New York 10036
                                    (212) 221-5700

                                    By:    /s/ Kevin J. Nash, Esq.