NATIONAL ARBITRATION AND MEDIATION

| | |
|---|---|
| ELLIOTT WELBURN, MIGUEL TORRES, and ALEX MANSO,<br><br>                              Claimants,<br><br>-against-<br><br>101 West 57 Restaurant LLC d/b/a The Wayfarer Restaurant, ESquared Hospitality LLC, and BLT Restaurant Group, LLC,<br>                              Respondents. | NAM File No. 1000218762 |

## **Introduction and Procedural History**

The Claimants and Respondents each move for summary judgment pursuant to Federal Rule of Civil Procedure 56 for summary judgment on the alleged violations of New York City Human Rights Law Section (NYC Adm Code Sections 8-102 (1), 8-107(1)(a) and New York State Executive Law Sections 292(5) and 296.  The motions are decided as set forth below.

In 2018, Claimants Alex Manso and Miguel Torres commenced certain actions in the Supreme Court of the State of New York in and for the County of New York.  That same year, Claimant Elliot Welburn served a Demand for Arbitration with National Arbitration and Mediation (NAM).  Torres also filed a Demand for Arbitration with NAM.  Thereafter, in November 2018, the Parties entered into an agreement whereby the pending state actions and the arbitrations were consolidated to be heard before a sole arbitrator assigned by NAM.  The parties proceeded through discovery under the

supervision of the assigned arbitrator. Fact discovery was closed on August 5, 2019 and a briefing schedule was established for the parties to make motions for summary judgment.

Eventually, the matter was reassigned to the undersigned arbitrator for the determination of the competing motions for summary judgment.

## Decision on Question of Admissibility of Respondents' Submission of Affidavits of John Tirch and Debra Mulholland

Prior to the assignment of this matter to the undersigned arbitrator, a dispute arose concerning the Respondents' submission of affidavits executed by John Tirch and Debra Mulholland in support of the Respondents' motion and in opposition to the Claimants' motion. The undersigned directed a further filing of the Parties' respective positions on that issue. Upon a review of the affidavits as well as the discovery previously exchanged, the arbitrator finds that there is nothing about the discovery exchange made by the Respondents which may be considered misleading and there was no impediment to the Claimants having sought to obtain non-party depositions of any former employee.

Having considered the original filings and the supplemental filings, the arbitrator accepts the affidavits and has considered same in rending this decision and order on the motions for summary judgment.

## Determination of the Competing Motions for Summary Judgment

## Standard for Motion for Summary Judgment

This arbitration is governed by the terms of the Parties' Agreement to
Arbitrate and NAM's Employment Rules and Procedures, and as such is
governed by the Federal Rules of Civil Procedure. Accordingly, the arbitrator
is guided by FRCP 56(c) which provides that summary judgment shall be
granted "if the pleadings, depositions, answers to interrogatories, and
admissions on file together with the affidavits . . . show that there is no
genuine issue as to any material issue of fact and that the moving party is
entitled to judgment as a matter of law."

It is settled that "the mere existence of *some* alleged factual dispute
between the parties will not defeat an otherwise properly supported motion
for summary judgment; the requirement is that there be no *genuine issue* of
*material fact*." *Anderson v Liberty Lobby, Inc.*, 477 US 242, 247-248 (1986)
(emphasis in original). Summary judgment is inappropriate when the
admissible materials in the record "make it arguable" that the claim or
defense has merit. *Quinn v Syracuse Model Neighborhood Corp.*, 613 F2d
438, 445 (2d Cir 1980)). "The evidence of the non-movant is to be believed,"
and all permissible "inferences are to be drawn in" favor of the party
opposing summary judgment. *Anderson v Liberty Lobby*, 477 US at 255. "In

sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict . . . "it must be quite clear what the truth is" *Kaytor v Electric Boat Corp.*, 609 F3d 537, 546 (2d Cir 2010) (internal quotations and citations omitted). Because there are competing motions for summary judgment, the Parties are entitled to the benefit of the foregoing standards to the extent they oppose the other's motion for summary judgment.

It is also settled that on a claim for gender-based discrimination, sexual harassment, hostile work environment and retaliation brought pursuant to the New York State Executive Law and the New York City Human Rights Law, the burden shifting analysis applied in claims brought pursuant to Title VII are to be applied. *See Ferraro v Kellwood Co.*, 440 F3d 96, 99-100 (2d Cir 2006). In order for the Claimants to prevail, they must establish *prima facie* each and every one of the elements of each of the claims, and only upon doing so does the burden shift to the Respondents to set forth legitimate, nondiscriminatory reasons for the adverse employment action at issue. Thereupon the Claimants must demonstrate that the legitimate non-discriminatory reason was a mere pretext. *Id.* On the other hand, in order for the Respondents to prevail on their motion for summary judgment, they

4

must establish as a matter of law that under no reasonable view of the evidence may the Claimants prevail before the trier of fact. *See Kaytor v Electric Boat Corp.*, 609 F3d at 546.

Founded on the Rule 56.1 statements, the affidavits and exhibits submitted by the parties, as it relates to the claims of sexual harassment and hostile work environment, there is no question of fact: Dominguez touched the genitals of the Claimants and others.

But the legal question remains whether the touching of genitals between persons of the same sex (here males) constitutes sexual harassment or discrimination where the Claimants concede that they did not believe or perceive that Dominguez had any intent or desire to engaged in same-sex relations with them and where they further concede that Dominguez's conduct was some combination of immaturity, horseplay and an effort to exercise his hierarchal dominance over them in the workplace. The answer to that question is strictly a question of law.

For the reasons set forth below, the arbitrator finds, as a matter of law, under the circumstances of this case, that Dominguez's conduct constituted sexual harassment and that same created a hostile work environment as defined by the New York City Human Rights Law. Upon that finding, the question as to whether the conduct constituted a violation of the New York

State Executive Law is rendered moot. Testimony concerning the severity and pervasiveness of the conduct shall be further explored at an evidentiary hearing to assess the question of damages.

**Findings of Fact**

Claimants Elliott Welburn ("Welburn"), Alexis Manso ("Manso") and Miguel Torres ("Torres") were employed by Respondent 101 West 57 Restaurant LLC at the Wayfarer ("The Wayfarer"). The Wayfarer's corporate parent is BLT Restaurant Group, LLC/Esquared Hospitality LLC ("BLT").

John Tirch ("Tirch") was the General Manager at The Wayfarer during the time that each of the Claimants was employed. Christopher Shea ("Shea") was the Executive Chef at the Wayfarer during the time that each of the Claimants was employed. Christian Dominguez ("Dominguez") was the Chef de Cuisine at the Wayfarer during the time that each of the Claimants was employed.

The three Claimants started working at The Wayfarer within one month of each other. Welburn started working at The Wayfarer on January 19, 2016. Torres started working at The Wayfarer on January 4, 2016. Manso started working at The Wayfarer in December 2015.

Before commencing a review of the undisputed facts, it is important to understand that Dominguez is no longer employed by the corporate

Respondents. He did not testify at an examination before trial nor is there
an affidavit from him refuting the allegations and the factual proof that
Dominguez touched the genitals of the Claimants or that he said the words
attributed to him by the Claimants. As previously stated, the touching of the
Claimants' genitals by Dominguez is a fact established by the record. Indeed,
one of the undisputed facts advanced by Respondents is that Dominguez's
touching was "part of the culture" and "he did it with the rest of his
coworkers" and "[t]hey each did it to each other, and they were cool with it."

More specifically, the record submitted in support of the competing
motions establishes that: i. Dominguez touched the testicles, penis and or
buttocks of the Claimants; ii. Dominguez engaged in chatter with Torres and
Manso regarding his sexual exploits with women; iii. the foregoing acts
occurred in the presence of one Claimant or the other and or in the presence
of other employees.

Whether Dominguez touched Welburn on more than one occasion is a
matter of dispute. As will be explained below, the frequency of the conduct
is a matter addressed to the question of damages, not liability.

As to Torres, the record establishes that Dominguez engaged in "slap-
boxing" with Torres and that this conduct escalated to being more "touchy
and grabby" such that Dominguez touched Torres' genitals on multiple

occasions. On another occasion, Dominguez tried to lick Torres' face. For a period of time, Torres and Dominguez would trade grabbing and hitting of each other in the testicles and buttocks and each would stick his fingers in the other's ears. This conduct was initiated by Dominguez. Another co-worker (Mendez) also touched Manso in the genitals.

As to Manso, Dominguez touched his genitals and called him "bitch" and "pussy" after Manso complained of Dominguez's behavior.

The Claimants concede that: i. Dominguez was "immature"; ii. they each considered the sexual touching "horseplay" and that Dominguez thought he was being "funny"; and iii. they did not believe that Dominguez was making homosexual advances to them or was touching them out of a desire to engage in homosexual activity with them. However, none of the Claimants considered the sexual touching to be appropriate horseplay, nor did they think Dominguez's conduct was funny. They each asked Dominguez to stop touching them. Dominguez ridiculed one or more of them when he was asked to stop touching them. The Claimants also conceded that Dominguez was an "equal opportunity harasser" who acted inappropriately towards men and women. Indeed, Welburn witnessed Dominguez embrace a female co-worker around her torso and also observed Dominguez touch the testicles of another co-worker who is not a claimant.

Welburn acknowledged that he told the psychologist to whom he was referred by counsel that he felt the purpose of Dominguez's "ongoing harassment was to humiliate him in front of others and to remind him of his place in the restaurant hierarchy unrelated to any sexual advance or actual interest." Although Welburn did not consider the touching to be of a homosexual nature or indicative of Dominguez's sexual interest, he did state that kitchen horseplay does not ordinarily involve physical or sexual touching but is more in the nature of pulling pranks on one another with kitchen equipment. Welburn also stated that another employee, Juan Mendez-Lopez, grabbed Welburn's genitals while they were in the kitchen. Although he had the authority to do so, Welburn did not discipline Mendez-Lopez. Torres and Manso also testified that they were humiliated. Notably, Manso also testified that Mendez-Lopez touched him inappropriately once or twice but stopped doing so when Manso objected.

To the extent that the Claimants seek to excuse their failure to timely file complaints against Dominguez, the arbitrator finds, as a matter of law, that the Claimants were actually or constructively aware that The Wayfarer had a policy barring harassment in the workplace. Each was given an employee handbook which spelled out that anti-harassment policy and the means for redress of same. To the extent the Claimants contend they were

not aware of the policy because they did not read the handbook, they failed to read the handbook at their own peril and must be charged with being no less than constructively aware of the anti-harassment policy.

Welburn acknowledged that he did not make his first complaint to the human resources department until on or about September 4, 2016. Notably, that complaint referenced the fact that Dominguez was touching others in their genital area. He also acknowledged that he is unsure whether he would have made a complaint as to Dominguez's conduct had he not been accused of theft shortly before he made the complaint. He contends that the accusation that he stole from the kitchen petty cash was a false accusation. Welburn testified that he did not initially make a complaint because Dominguez was his superior and because he wanted to fit in and be part of the team. Welburn acknowledged that when he made the complaint, there was an investigation and anti-harassment training was instituted. Tirch authored an email wherein he acknowledged that he observed inappropriate conduct perpetrated by Dominguez. He does not define the conduct as sexual touching.

Unlike Welburn, Torres never contacted management regarding Dominguez's sexual touching. Torres also considered Dominguez's conduct as part of his efforts to "play with everyone, or in his head, the term playing."

He acknowledged that initially he had no problem with the touching and engaged in that conduct himself, but asked Dominguez to stop touching him. Torres was warned about his own inappropriate sexual conduct as it related to certain comments he made to a female employee regarding the fit of her blouse. He signed a paper regarding the policy because he felt he would be fired if he did not sign the paper. Like the employee handbook, Torres stated that he did not read the paper before he signed it.

Manso also did not make any complaints to the human resources department or management concerning Dominguez's behavior. However, he did complain to Tirch and Shea. Manso concedes that he had a friendly relationship with Dominguez. They would often take cigarette breaks together and talk about Dominguez's sexual encounters as well as about the restaurant and their complaints about other employees. Manso very explicitly told Dominguez to stop touching him. Manso testified that Dominguez did not like it when Manso told him to stop touching him. He told Dominguez to stop calling him a "bitch or a pussy in front of people" because he found it to be intimidating and humiliating. He acknowledged that initially he found the touch-play to be funny, but when Dominguez continued to touch him or verbally berated him, it was "not funny anymore." He also testified that early on he put up with Dominguez's conduct because

he wanted to keep his job and it seemed like it was the "norm" or the "culture" of the workplace. But that it got to the point where he could not take it anymore.

## Conclusions of Law: Gender-Based Discrimination, Sexual Harassment and Hostile Work Environment under the New York City Human Rights Law

The New York City Human Right Law, while not a code of general civility, is far more expansive in its reach as the question of liability for discriminatory behavior than the New York State Executive Law and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") as amended. Under the New York City Human Rights Law, the conduct need not reach the level of being severe or pervasive. *See e.g. Meritor Savings Bank, FSB v Vinson*, 477 US 57, 67 [1986]; *Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 310 [2004]). In *Nelson v HSBC Bank USA*, 87 AD3d 995 (2d Dept 2011), the Appellate Division, Second Department noted the expansiveness of the remedial intent of the 2005 amendments to the New York City Human Rights Law:

> In 2005 the New York City Council enacted the Local Civil Rights Restoration Act of 2005 (Local Law No. 85 [2005] of City of NY [hereinafter the Restoration Act]), amending the New York City Human Rights Law (Administrative Code of City of NY § 8-101 et seq). The express purpose of the law was "to clarify the scope" of the City's Human Rights Law because it was "the sense of the Council that New York City's Human Rights Law has been construed too narrowly to ensure protection of the civil rights of

all persons covered by the law" (Local Law No. 85 [2005] of City
of NY § 1). The Council sought to "underscore" that the
provisions of the City's law are to be construed independently of
similar provisions of state and federal human rights laws and
declared that interpretations of similarly worded provisions are
to be viewed "as a floor below which the City's Human Rights law
cannot fall, rather than a ceiling above which the local law cannot
rise" (Local Law No. 85 [2005] of City of NY § 1).

While there were some other changes, "the core of the measure
was its revision of Administrative Code § 8-130, the construction
provision of the City HRL" (*Williams v New York City Hous.
Auth.*, 61 A.D.3d 62, 66 [2009]; see Gurian, A Return to Eyes on
the Prize: Litigating under the Restored New York City Human
Rights Law, 33 Fordham Urb LJ 255 [2006]). The
Administrative Code of the City of New York was amended to
state: "The provisions of this title shall be construed liberally for
the accomplishment of the uniquely broad and remedial
purposes thereof, regardless of whether federal or New York
State civil and human rights laws, including those laws with
provisions comparably-worded to provisions of this title, have
been so construed" (Administrative Code § 8-130). Indeed, it is
now beyond dispute that the provisions of the New York City
Human Rights Law must be construed "broadly in favor of
discrimination plaintiffs, to the extent that such a construction is
reasonably possible" (*Albunio v City of New York*, 16 N.Y.3d 472,
477-478 [2011]).

The legislative history of the 2005 amendments conveys that
they were undertaken to correct a perceived failure by courts to
appreciate the scope of earlier comprehensive amendments to
the City's Human Rights Law in 1991 and to "again under-
scor[e]" that the protections afforded by the City's law are not to
be limited by restrictive interpretations of similarly worded state
and federal statutes (Rep of Comm on Gen Welfare on Prop. Int.
No. 22-A, at 2 [Aug. 17, 2005]; see Local Law No. 39 [1991] of
City of NY).

The *Nelson* court concluded that under the New York City Human
Rights Law, the "questions of 'severity' and 'pervasiveness' are applicable to
consideration of the scope of permissible damages, but not to the question of
underlying liability" because the purpose of the amendment was to maximize
deterrence (*Nelson v HSBC*, 87 AD3d 999 quoting *Williams v New York City
Hous. Auth.*, 61 AD3d 62, 76 (1st Dept 2009). In *Williams*, the First
Department held that it would not be inappropriate to conflate sexual
discrimination and sexual harassment because the latter is merely a subset
of the former. *Williams* at 75. The proscription of the administrative code
bars "imposing different terms, conditions and privileges of employment
based on, *inter alia*, gender. *Id.* But the issue cannot be, and is not, limited
to gender – the question is whether Dominguez's conduct was because of
gender *or* sex.

Claimants rely principally on *Redd v N.Y. State Div. of Parole* (678 F3d
166 (2d Cir 2011)) in support of their contention that Dominguez's touching
of their genitals was "direct contact with an intimate body part" and, as such,
it "constitutes one of the most severe forms of sexual harassment." *Id.*
quoting *Worth v. Tyer*, 276 F3d 249, 268 (7th Cir 2001). In *Redd*, the
plaintiff's supervisor touched up against the plaintiff's breasts on three
different occasions and was described as brushing up, rubbing up and

touching the plaintiff's breasts. *Redd v N.Y. Div. of Parole*, 678 F3d at 177.

The District Court (923 FSupp2d 371 [EDNY 2012]) granted the defendant's

motion for summary judgment. On appeal, as Respondents correctly

contend, the Second Circuit reversed principally upon the ground that there

was a question of fact as to whether the plaintiff could reasonably have

perceived her supervisor's three-time touching as "homosexual advances."

*Redd v N.Y. Div. of Parole*, 678 F3d at 179. Although the court reversed upon

the specific ground that there was a question of fact as to whether the

supervisor's conduct could reasonably, be perceived as homosexual, the

court's scope of the analysis is not so limited and informs the determination

of these motions. The Second Circuit's reversal included the following

analysis and, as more fully explained *infra*, is not limited to homosexual

desire or intent as the sine qua non of same-sex harassment:

> If the claim were that a supervisor--of either gender-
> -stated to a female employee "I want to feel your
> breasts," or stated to a male employee "I want to feel
> your penis," a jury could easily infer that that stated
> desire was because of the employee's sex. A district
> court could not properly rule as a matter of law that
> that gender-specific harassment was not because of
> the employee's sex. It is no more permissible to rule
> as a matter of law that the supervisor's harassment
> was not because of the employee's sex when the
> supervisor repeatedly--albeit silently--touched,
> rubbed up against, and felt those gender-specific,
> intimate parts of the employee's body. Given the
> permissible inference that Washington's touchings

were not accidental, we cannot affirm a dismissal
that, in effect, holds that such repeated sexually
abusive, gender-specific actions are less probative
than words.

*Id.* at 181.

Notwithstanding the more liberal standard under the New York City
Human Rights Law as compared to claims made under Title VII, the analysis
applied in the Title VII cases is instructive.   Of course, if the conduct
complained of would constitute a violation of Title VII, then the same facts
would establish a claim under the New York City Housing Law.  The EEOC
guidelines relevant to sexual harassment claims under Title VII are also
instructive.  They provide as follows:

§ 1604.11 Sexual harassment.

(a) Harassment on the basis of sex is a violation
of section 703 of title VII. 1 Unwelcome sexual
advances, requests for sexual favors, and other verbal
or *physical conduct of a sexual nature constitute
sexual harassment when* (1) submission to such
conduct is made either explicitly or implicitly a term
or condition of an individual's employment, (2)
submission to or rejection of such conduct by an
individual is used as the basis for employment
decisions affecting such individual, or (3) *such
conduct has the purpose or effect of unreasonably
interfering with an individual's work performance
or creating an intimidating, hostile, or offensive
working environment.*

(b) In determining whether alleged conduct
constitutes sexual harassment, the Commission will
look at the record as a whole and at the totality of the

circumstances, such as the nature of the sexual
advances and the context in which the alleged
incidents occurred. The determination of the legality
of a particular action will be made from the facts, on
a case by case basis.

29 CFR 1604.11. (emphasis added).

Under Title VII, "when a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor discriminates on the basis of sex." *Meritor Savings Bank, FSB v. Vinson*, 477 US 57, 64 (1986) (emphasis added). And, we know, "sex discrimination consisting of same-sex sexual harassment is actionable under Title VII" *Oncale v Sundowner*, 523 US 75, 82 (1998). Of course, same-sex discrimination is therefore no less actionable under the more liberal New York City Human Rights Law. *See Redd v New York City Div. of Parole, supra.*

Under the New York City Human Rights Law satisfaction of the qualitative descriptors "severe", "pervasive" or "permeated" is no longer required; rather, the conduct is actionable when it *alters the condition of employment*, and when it does so, there is an abusive or hostile working environment. *Id.* Even under Title VII "the kinds of workplace conduct that may be actionable . . . include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal *or physical conduct of a sexual nature.*'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. at 65 (quoting 29 C.F.R. § 1604.11(a) (1985) (emphasis added)). To be sure, mere male-on-male

horseplay such as pulling another's pants down or pulling up one's shirt and licking one's own chest (*see Black v Anheuser-Busch In Bev*, No. 14 Civ 2693 (SDNY July 13, 2016) is not actionable, nor is ordinary socializing, including innocent intersexual flirtation. *See Oncale v Sundowner*, 523 US at 81.

Here, the Claimants are males. They were victims of intimate sexual touching but not by a male homosexual. Also, they concede, and therefore it is a fact, Dominguez was not grabbing their testicles because of sexual desire.

Do the laws imposing liability for sexual harassment in the workplace excuse the conduct of a homosexual male worker who grabs a female co-worker between her legs or gropes her breasts or pinches her buttocks where the female worker conceded that the male had no sexual interest in her but only sought to exert his hierarchal dominance over her in the workplace by touching her intimate body parts? Of course, if the Claimants here were women, the parties would, no doubt, not be in a pitched battle.

Here, the question is whether the laws imposing liability for sexual harassment in the workplace contemplate the circumstances where a heterosexual male worker grabs the genitals of a male co-workers where the co-workers conceded that the male had no sexual interest in them but sought only to exert his hierarchal dominance over them by touching their intimate body parts?

The laws imposing liability for sexual harassment in the workplace do not make that make that distinction. That is not what "because of sex" means. The dichotomy would be wholly unexplainable and contrary to the scope and reach of the New York City Human Rights Law.

The *Oncale* opinion and a logical reading of its rationale requires no such distinction. The Supreme Court emphasized that there must be a careful inquiry of "the social context in which the particular behavior occurs and is experienced by the target." *Id.* Toward that end, the court offered the following example: "A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field, even if the same behavior would reasonably be experienced as abusive by the coach's secretary (*male or female*) back at the office." *Id.* (emphasis added).

Here, grabbing the worker's genitals was more than "simple teasing or roughhousing among members of the same sex" (*Id.* at 82). It was properly characterized as conduct intending to exert hierarchal dominance in the workplace. It was therefore hostile and abusive. This was not the circumstance where the football coach merely smacked his player on the buttocks as a form of encouragement as the player runs out onto the field. Would it be permissible for the coach to grab the player's testicles as a

reminder that the coach rules the team and the player better perform for the coach?

In *Redd*, the Second Circuit held "[t]he line between complaints that are easily susceptible to dismissal as a matter of law and those that are not is indistinct. On one side lie [complaints of] *sexual assaults*; [other] physical contact[, *whether amorous or hostile*, for which there is no consent express or implied]; uninvited sexual solicitations; *intimidating words or acts*; [and] obscene language or gestures. *Redd v New York Div. of Parole*, 678 F3d at 177. (internal citations and quotation marks omitted). That conduct is clearly actionable under the New York City Human Rights Law. *Id.* "On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." Even so, even "on either side of the line there are, depending on the circumstances, gradations of abusiveness." *Id.*

> Casual contact that might be expected among friends [a] hand on the shoulder, a brief hug, or a peck on the cheek would normally be unlikely to create a hostile environment in the absence of aggravating circumstances such as continued contact after an objection.... And [e]ven more intimate or more crude physical acts a hand on the thigh, a kiss on the lips, a pinch of the buttocks may be considered insufficiently abusive to be described as 'severe' when they occur in isolation.... But when the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers ... it becomes increasingly difficult to write the conduct off as a pedestrian annoyance. *Patton v Keystone RV*

> *Co.,* 455 F3d 812, 816 (7th Cir 2006) ("Patton")
> (internal quotation marks omitted) (emphasis
> added). "[D]irect contact with an intimate body part
> constitutes one of the most severe forms of sexual
> harassment." *Worth v Tyer*, 276 F3d 249, 268 (7th
> Cir 2001).

*Id.*

Here, there was no mere pedestrian annoyance. There was contact

with the intimate body part of the male anatomy, that body part which

defines the Claimants as males, and, as such, it was *because of sex*.[1] The

contact was for the purpose, at least in part, to exercise dominance and it was

therefore hostile.

As the *Redd* court noted, the foregoing principles are well established

in cases involving heterosexual conflicts and that it is easy to draw the

inference of discrimination in those circumstances. *Id.* As stated above: if

the Claimants were women there would be no argument, Dominguez's

conduct would be abusive. In same-sex harassment cases, however, an

inference that physical contact was because of the employee's sex may be less

evident because the challenged conduct may not typically involve the

"explicit or implicit proposals of sexual activity found in most male-female

sexual harassment situations." *Id.* Surely, if the same-sex harasser was

homosexual, then the chain of inference that is allowed in heterosexual

---

[1] For the purposes of this discussion, we speak in terms of the biological male and we need not address
the emerging questions gender stereotyping, gender roles, gender identify, or gender expression.

claims, involving males on one side and females on the other, would be available to the victim. *Id.* But the law does not require an amorous intent or desire.

The EEOC guidelines set forth above do not require amorous intent or desire but only "physical conduct of a sexual nature [that] constitute[s] sexual harassment when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." This is because neither a man nor a woman is required to run a "gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Meritor*, 477 U.S. at 67.

Citing *Oncale*, the *Redd* court wrote:

> The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual. But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace. Whatever evidentiary route the plaintiff chooses to follow, he or

>           she must always prove that the conduct at issue was
>           not merely tinged with offensive sexual connotations,
>           but actually constituted "discrimina[tion]... because
>           of ... sex." *Oncale,* 523 US at 80-81.

*Id.* at 177-178.

Here, the Respondents point to the Claimants' testimony that Dominguez grabbing their testicles was his demonstration of his power over them. Contrary to the Respondents' argument that is not a mitigating factor to take the conduct beyond the scope of the anti-discrimination laws.

Under *Oncale,* if Dominguez attempted to exercise his hierarchal dominance over the Claimants by assigning them to demeaning tasks or physically assaulting them in a non-sexual way (smacking them, play punching or the like), for the Claimants to assert a viable sex discrimination claim against the Respondents, the Claimants would have to show that they were treated differently from female co-workers because there is nothing sexually explicit about demeaning assignments or the non-sexual physical assaults. Evidence of the disparate treatment would be necessary to shed light on the sexually discriminatory intent. Under those circumstances, without evidence of disparate treatment by gender, there would be no viable claim under any of the anti-discrimination laws – federal, state, or New York City – because the demeaning assignments and non-sexual physical assault

are gender neutral. *Id.; see also Doe v City of Belleville,* 119 F3d 563, 580

(7th Cir 1997), *vacated and remanded,* 523 US 1001 (1998).[2]

But here, where the physical contact was of an explicitly sexual nature,

because there was a grave intrusion on the male sexual organ, there need be

no showing that the touching was done for Dominguez's sexual pleasure or

that Dominguez did not touch female employees in such an explicitly sexual

way.[3] *Id. See also Quick v Donaldson Co.,* 90 F3d 1372, 1379 (8th Cir 1996)

("The bagging was aimed at Quick's sexual organs, his testicles were

squeezed so hard on one occasion that he almost passed out from the pain,

he was punched in the neck, and he was verbally taunted with names such as

"queer" and "pocket lizard licker." Whether or not these actions, when

viewed in the totality of the circumstances, constituted prohibited sexual

harassment remains a genuine issue of material fact for trial."). The touching

here "was humiliating in a deeply personal way, as only sexual acts can be."

*See Doe v City of Belleville,* 119 F3d 580.

---

[2] The vacatur and remand was for further consideration by the Circuit Court upon the Supreme Court's opinion in Oncale as to the retaliation claim but did not affect the Circuit Court's determination that gender stereotyping evidenced by abusive and demeaning homophobic and other sex-tinged language as well as sexual physical assault of grabbing one of the plaintiff's testicles was sufficient to warrant a determination by the trier of fact.

[3] It matters not that, as to Welburn, there is a question of fact whether Dominguez grabbed his testicles on one or more than one occasion because even one instance of discriminatory conduct may be actionable where it is "extraordinarily severe". *See Cruz v Coach Stores, Inc.,* 202 F3d 560, 570 (2d Cir 2000). The frequency of the touching is an element of damages under the New York City Human Rights Law.

The manner in which Dominguez embraced the female worker is not sufficiently developed in the record to determine whether it was more than a pedestrian annoyance. Nevertheless, it matters not. Even assuming that Dominguez touched the female worker in a sexually explicit way such that one could not conclude that he was indeed, as he was described, an "equal opportunity harasser," the determination reached here would not change. To do so would suggest that there is an acceptable dichotomy in the law. The law would permit the exclusion of Dominguez's conduct here from the scope of sexual harassment liability where the law recognizes that the fondling or grabbing of a woman's breasts or the pinching of her buttocks is recognized to be "because of sex". The law does not permit that dichotomy. The sexual orientation of the harasser does not matter. *Id.* Neither a man nor a woman is required to run a "gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Meritor*, 477 U.S. at 67.

Furthermore, sexual harassment need not be motivated by sexual desire because sexual harassment is a form of victimization and victimization is often motivated by the exercise of power, control and dominance which are issues not necessarily related to sexual preference. *See Doe v City of Belleville*, 119 F3d 580. The Claimants perceived Dominguez's conduct as his attempt to assert his hierarchal power over them. The hierarchal

dominance was exercised in an explicitly sexual way by grabbing the male sexual organs. There is simply no reasonable view of the evidence under which that conduct may be viewed as meeting socially acceptable norms.

The Claimants were the victims of sexual harassment and a hostile work environment as defined by the New York City Human Rights Law. They are entitled to a hearing on the assessment of damages.

In light of the findings set forth above, the question of liability under the New York State Executive Law is academic.

## Conclusions of Law: Retaliatory Employment Action

As to Welburn, the competing motions for summary judgment as to the claims for retaliatory employment action are both denied. There is evidence that he was under investigation for taking money from petty cash by putting in false claims. There is evidence that Welburn's allegations as against Dominguez were investigated and that training was conducted. There is evidence that employees complained of Welburn's behavior, that he yelled and was verbally abusive such that employees purportedly quit working for The Wayfarer. Welburn was looking for another job at the time that his employment was terminated. Accordingly, there is a dispute as to whether Tirch terminated Welburn's employment because of his prior performance issues and because multiple employees complained about Welburn's angry

outbursts that included yelling, profanity and throwing objects at employees, behavior that was unacceptable for a manager and caused two other managers to quit.

As to Torres, the Respondents are entitled to summary judgment dismissing this claim. The proximity in time before an adverse employment action and a complaint may permit an inference that the adverse employment action was retaliatory. The Respondents contend that Torres was terminated for poor performance and for harassing female workers. Torres testified that he is not claiming he was terminated for resisting sexual advances by Dominguez and that he does not know why his employment at The Wayfarer was terminated. He also acknowledged that management's motivation for firing him was because of his lateness and because he had harassed a female employee. He acknowledged that the complaints of his lateness were legitimate such that he could have been terminated for his lateness. He also acknowledged that he was in fact disciplined for harassing a female worker. On the other hand, Torres testified that he believed his termination was in retaliation for resisting what he believed to be the sexual advances of another worker. However, he could point to no evidence to support that contention and could point to no evidence to suggest that

anyone in a management capacity was aware of the incident between him and the other worker.

Upon the foregoing, the Respondents established a non-pretextual basis for the firing of Torres and Torres has failed to rebut that evidence. The Respondents' motion for summary judgment is granted. Torres's motion is denied.

As to Manso, the competing motions for summary judgment concerning the claim for retaliatory eviction present a much closer question. Accordingly, both motions are denied. Manso never contacted management to complain of Dominguez's conduct. Manso did not initially complain about Dominguez's conduct. He tolerated the conduct because it thought it was the norm. He testified that he complained about Dominguez's conduct shortly before he cut his hand on a kitchen instrument known as a mandolin around August 9, 2016. Manso was upset he received a cut and felt the restaurant should have treated him for the cut that happened at work. Instead, he claims that Dominguez told him to put lemon juice on the cut which made him upset and that he was thereafter taunted by Dominguez with names like "bitch" and "pussy" which he attributed to being in response to his complaint about Dominguez. Manso acknowledged that he moved up in position to the fish station and that he thereafter "quit of [his) own reconnaissance" and he

"left on [his] own terms in the sense that [he] didn't get fired." Manso
testified that he left his employment at The Wayfarer because the hostile
work environment was not going to change and no one in management was
going to help him.   He testified that for Shea and Dominguez, sexual
harassment was normal behavior and those who couldn't take being touched
in the genitals were not "tough".  Manso felt it would be easier to find a new
job than try to resolve the hostile work environment at The Wayfarer, as all
of his efforts to resolve the hostile work environment had been unsuccessful.
He was also frustrated by his pay as it was compared to other less productive
workers.  But he also testified that he wanted to leave before he cut his finger,
but stayed around because he "needed the money for student loans, et
cetera."

## Direction for the Scheduling of a Further Hearing

The NAM Administrator is directed to contact counsel for the purposes
of scheduling a hearing for the assessment of damages on the Claimants'
claims of sexual harassment and hostile work environment:  The claims of
Welburn and Manso on the question of adverse retaliatory employment
action; The assessment of damages on the Claimants' claims of sexual
harassment and hostile work environment; and as to Welburn and Manso, if

they prevail on their claims for adverse retaliatory employment action, the

assessment of damages thereon.


Dated: Garden City, N.Y.
       August 5, 2020

Hon. Peter B. Skelos, Ret'd
Arbitrator


The arbitrator herein, Hon. Peter B. Skelos, affirms, pursuant to CPLR 7507, that I am the arbitrator of the arbitration captioned above having been assigned by NAM and that I render this decision and pursuant to the governing rules and procedures and the agreement of the parties on this the 5th Day of August, 2020.

Hon. Peter B. Skelos, Ret'd