| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date and Time:<br>July 21, 2022 at 10:00 a.m. |

-------------------------------------------------------------x

In re:                                             Chapter 11

BLT Restaurant Group LLC,                          Case No. 22-10335 (LGB)

                           Debtor.

-------------------------------------------------------------x

## SEXUAL HARASSMENT CLAIMANTS'
## OBJECTION TO DEBTOR'S MOTION TO SELL ASSETS

      Elliott Welburn, Miguel Torres and Alexis Manso (collectively, the "Sexual Harassment Claimants"), as and for their Objection to the motion filed by BLT Restaurant Group (the "Debtor") to sell "substantially all of its assets" (ECF No. 101) (the "Sale Motion"), respectfully states and alleges as follows:

### Preliminary Statement

      1.    It is very disappointing that with the approval of the Amended Disclosure Statement (ECF No. 68) being held in abeyance pending a Court-Ordered mediation, the Debtor is now attempting to undercut the entire process by a premature sale outside of a plan without solicitation of votes from creditors. The Sale Motion is obviously a *sub rosa* plan and cannot be properly entertained at this juncture since there are no pressing business exigencies requiring the immediate sale of anything.

      2.    To make matters worse, there is no third party stalking horse. The sale is designed to payoff insider loans while allowing insiders to walk-off with the Company for a pittance  The Debtor has unilaterally given full recognition to potential credit bid rights of insiders even though their secured claim is disputed and can easily be challenged or reclassified if mediation is unsuccessful. The Sexual Harassment Creditors have only held off on further litigation because of the pending mediation.

3.	Conversely, the Debtor is defying the Court's meditation Oder by continuing prior efforts to expedite certain parts of the Chapter 11 case, while allowing other parts to languish. The mediation, which was Ordered on May 18, 2022 (ECF No. 84), has not even begun, largely because the Debtor initially offered Richard Levy as mediator without disclosing that his firm previously represented affiliates of the Debtor.

4.	After it was determined that Mr. Levy could not possibly serve, the Debtor compounded the delay by failing to respond to two recommendations by the Sexual Harassment Creditors that either Lori Lapin Jones or Kenneth Silverman be named as mediator. Each of these individuals is a highly respected panel trustee, and has served successfully in a number of mediations. The fact that the Sexual Harassment Creditors cannot even get agreement from the Debtor on the name of a mediator speaks volumes about its lack of good faith.

5.	Now, with the mediation stalled and the confirmation process in abeyance, the Debtor suddenly proposes to sell all of its assets to its 99% member, JL Holdings 2002 LLC (the "Insider Lender") for a net of only $150,000 for other creditors.

6.	The Sexual Harassment Creditors object to the proposed sale process on numerous grounds, starting with the fact that there is no need to rush to sell assets outside of a plan and to do otherwise would violate fundamental principles of law. *See, In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983) ("Just as we reject the requirement that only an emergency permits the use of § 363(b), we also reject the view that § 363(b) grants the bankruptcy judge *carte blanche.* Several reasons lead us to this conclusion: the statute requires notice and a hearing, and these procedural safeguards would be meaningless absent a further requirement that reasons be given for whatever determination is made; similarly, appellate review would effectively be precluded by an irreversible order; and, finally, such construction of § 363(b)

2

swallows up Chapter 11's safeguards."). Indeed, the Second Circuit has specifically cautioned against *sub rosa* plans, explaining:

> The [Debtor-in-Possession] is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization. The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of Chapter 11 for confirmation of a reorganization plan.

*In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (internal quotation marks and citations omitted).

7. Second, the Debtor has completely failed to justify the proposed stalking horse price of $750,000. The value of the assets is open to question because the Debtor is a holding company that operates certain restaurants and receives additional income from management and licensing fees relating to other restaurants, each of which is a separate corporate entity, yet only the parent company filed a petition in bankruptcy, without the operating subsidiaries following suit. If all of the companies were under the jurisdiction of the Court, it might have a significant impact on how the assets can be marketed and sold.

8. Third, and perhaps, most important, there are serious issues concerning the validity and extent of the secured claim asserted by the Insider Lender which call into question its right to credit bid. The Sexual Harassment Creditors respectfully submit that the proposed sale process must await completion of the mediation and cannot be outside of the plan confirmation process.

### The Sale Motion Should be Rejected or Deferred Until Confirmation

9. The primary concern here is that by rushing to sell, the recovery for the estate will be minimal, with the benefits heavily weighted in favor of the Insider Lender. The Debtor proposes only a thirty day marketing period, and has failed to demonstrate that it has taken any

serious steps to generate interest in the sale except for a single mention of a data room, without any information as to who has been provided with the URL and what information can be found there.

10. The proposed sale price will generate net proceeds of $150,000 for creditors other than the Insider Lender. The Sexual Harassment Claimants, who have already been awarded summary judgment as to liability, have filed individual claims in the amount of $3,508,918.00 each, while additional proofs of unsecured claims totaling over $4 million were filed by other creditors. The $150,000 carve out amounts to around 2%. This *de minimis* recovery is even worse when one takes into account the fact that in the Debtor's filed disclosure statement, priority claims are said to be zero, notwithstanding that proofs of priority claims in the total amount of approximately $1.8 million have already been filed by federal, state and city taxing authorities.

11. In the absence of a detailed showing of the value of the assets being offered for sale, the proposed sale price is far too small to justify a stalking horse bid to an insider without an experienced third party broker marketing the assets over a reasonable period of time. The need for a more robust sale process is further underscored by the fact that there are a number of open questions concerning the alleged secured claim of the Insider Lender.

**Infirmities with the Secured Claim**

12. As set forth in the chart appended to the Insider Lender's proof of claim, a copy of which is annexed hereto as Exhibit "A" (the "Chart"), from the Debtor's inception in 2004 through February 2019, the Insider Lender claims net capital contributions of $32,489,233.78 after payment of certain distributions. In or about March 2019, the capital contributions ended and at some point thereafter the Debtor and the Insider Lender allegedly executed a loan

4

agreement, creating a line of credit for all future advances. The original loan documents have not yet been produced, so the precise terms of the loan are not known, including whether there was a cap on the amount of the line of credit.

13. The Debtor and the Insider Lender subsequently executed an amended loan agreement on February 20, 2020, at which time the Debtor also executed a security agreement and pledge agreement, and filed a UCC-1 financing statement (the "First Amended Loan Documents"), purportedly setting a credit limit on the loan at $5 million. The First Amended Loan Documents provide for interest to accrue, but require no payments for ten years after the execution of the First Amended Loan Documents. These are hardly typical terms for a commercial loan negotiated at arms-length with a third-party lender.

14. According to the Chart, the Debtor has made no payments whatsoever from the first loan on March 7, 2019 through the filing of the Chapter 11 petition March 22, 2022. Moreover, by mid-2020, the Debtor had exceeded the $5 million cap on the line of credit, without any apparent repercussions. The Sexual Harassment Creditors have requested the banking and financial records of the Insider Lender to determine the source of the loans themselves.

15. On January 20, 2022, at a time when the Chart shows a total borrowing of $7,231,000, and only two months prior to the Chapter 11 filing, the Debtor and the Insider Lender executed a second amended note, pledge agreement and loan agreement retroactively increasing the line of credit to $10 million. These loan documents have also not yet been produced, but it appears that the Debtor may have executed the second amendment on the eve of the bankruptcy filing in an effort to protect its secured claim to the extent the loan exceeded the $5 million credit limit.

16. Based on the terms of the loan documents and the timing of the Chapter 11 filing, there is a substantial argument to be made that the loan should be recharacterized as a capital contribution or otherwise subordinated to non-insider creditors. That insiders filed a UCC-1 financing statement does not elevate their claim's priority, particularly where, as here, it was filed a year after the security agreement was allegedly executed.

17. As the Hon. Robert Gerber noted in *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration,* No. 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008):

> The paradigmatic situation for recharacterization [is] where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.

18. The factors which are to be considered by the Court were enumerated by the Sixth Circuit Court of Appeals as follows:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749-750 (6th Cir. 2001). The *AutoStyle* have been adopted in this District. *See, In re Live Primary, LLC*, 626 B.R. 171, 197-98 (Bankr. S.D.N.Y. 2021) ("The exercise of this power to recharacterize is essential to the implementation of the

6

Code's mandate that creditors have a higher priority in bankruptcy than those with an equity interest.") (internal citations and quotation marks omitted).

19. This case presents many of the characteristics of a claim that is subject to recharacterization as capital in bankruptcy. While there has not yet been a formal objection to the Insider Lender's claim, the presence of these factors requires that the proposed sale process be examined with great care.

20. It is also noteworthy that, even if the secured claim asserted by the Insider Lender is ultimately allowed, it does not automatically follow that the Insider Lender should be permitted to credit bid.

21. Section 363(k) of the Bankruptcy Code provides in pertinent part as follows:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures and allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property. 11 U.S.C. § 363(k).

22. As the statute provides, "[T]he right to credit bid is not absolute." *In re Aéropostale, Inc.*, 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016), *citing In re Free Lance-Star*, 512 B.R. at 808; *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014). Indeed, Section 363(k) of the Bankruptcy Code affords courts discretion to prevent secured creditors from credit bidding "for cause"; *see In re Phila. Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.").

23. In short, there has been no showing that the sale must be conducted immediately. In light of the relationship between the Debtor and the Insider Lender the best course of action is

to defer any sale effort until the mediation is concluded and a confirmation hearing is scheduled.

The right of the Insider Lender to credit bid can then be properly explored at that time.

      **WHEREFORE**, for all of the reasons set forth above, the Sale Motion should be denied.

Dated: New York, New York
       July 14, 2022

                            GOLDBERG WEPRIN
                            FINKEL GOLDSTEIN, LLP
                            Attorneys for the Sexual Harassment Claimants
                            1501 Broadway, 22nd Floor
                            New York, New York 10036
                            (212) 221-5700

                            By:    /s/ Kevin J. Nash, Esq. .